ERASTUS CORNING and JOHN F. WINSLOW, Respondents, *v.* THE TROY IRON AND NAIL FACTORY, Appellant.

Equity will interpose, by mandatory injunction, to compel the restoration of running water to its natural channel, when wrongfully diverted therefrom, at the suit of the party whose lands include either the whole or a part of such channel.

The grounds for equitable interposition in such a case are two-fold: First, the inadequacy of any legal remedy to secure the party in the enjoyment of his right to have the water flow in its natural channel. Second, to prevent a multiplicity of suits for damages accruing from the daily and continuous wrongful diversion of the stream.

Since the Code, it is not necessary that the right should be first established in a suit at law.

The fact, that the stream would not be put to any artificial use, when restored, by those entitled to its restoration, and that such restoration would be of slight advantage to them, and cause great injury and loss to the parties wrongfully diverting it, is no valid objection in equity, to decreeing such mandatory injunction.

Where a party owning the land on one side of a stream, upon which he has long maintained a dam built to the opposite bank, takes from an owner on the opposite bank a lease of his land there situate, "together with the benefit and use of all falls and water upon, running through, or adjoining the premises" leased, he is precluded from thereafter claiming an adverse, exclusive user of the water along the leased premises, against the lessor.

One who, while owning and using a water privilege upon a stream, assents to the erection of expensive machinery for the diversion of the water by another, upon one side of the same stream above him, is not thereby estopped, upon subsequently purchasing the lands on the stream immediately opposite the machinery so erected, from demanding that the water should be restored along the lands so purchased, to its natural channel, though such restoration will cause great loss to the party erecting the machinery.

Where one leases, for a long term, land traversed by or adjoining a stream of water, and does not object to, but expresses approval of, the erection by the lessee, during the term, of works of a permanent and expensive character for the diversion of the water from the stream, in its whole course through or past the leased premises, to other land belonging to the lessee, and the operation of extensive machinery on such other land, by means of such diversion, the lessor is, nevertheless, not estopped from claiming a restoration of the stream to its natural channel, at the expiration of the term.

A conveyance of land carries with it, as appurtenant, the right to the flow of water in its natural channel, over the land so conveyed. The statute, making conveyances of land adversely held void, does not apply to such appurtenant rights, and they pass to the grantee, although a diversion of the water was made before the conveyance, and the right to such diversion is, at the time of the conveyance, claimed by the party causing it.

(This cause was re-argued on the 15th of January, 1869, and decided March 20th, 1869.)

THIS action was brought to obtain a perpetual injunction against the defendant, restraining it from diverting the waters of a portion of the Wynant's kill, in the city of Troy, along the land of the plaintiffs, and to compel the defendant to restore to their natural bed or channel, the waters of the kill, diverted by the defendant. The complaint also asked for damages sustained by reason of the diversion of the water, and for general relief.

The premises, where the controversy arose, are part of a farm of 125 acres, conveyed, in 1788, by a warranty deed, without exception or reservation, from Stephen Van Rensselaer to Jeremiah Lansing. In 1789, Jeremiah Lansing conveyed to David De Forest the same premises, and by the same description, with an exception in these words:

"Excepting, and always reserving, one acre of land on *the*

*south side* of the creek, and adjoining to the creek, where the line crosses the said creek, *unto Stephen V. Rensselaer*, Esquire, proprietor of the manor of Rensselaerwyck, and to his heirs and assigns forever."

The heirs of David De Forest (or Defreest, as the name was afterwards written), in 1852, conveyed to the plaintiffs, what is called, in the case and in the opinions, the seven acre lot, and which is a part of the farm of 125 acres conveyed from Van Rensselaer to Lansing, and from Lansing to De Forest.

This seven acre lot lies on the north side of the Wynant's kill, and includes within its outer boundaries, as described in the plaintiffs' deed, the acre of land excepted in the deed from Lansing to De Forest, and then excepts it in the identical language of the original exception.

At the place where the seven acre lot is located, the Wynant's kill takes a bend to the north, in the shape of a horse shoe, and the excepted acre lies within the bend, on the south side of the creek, the seven acre lot, on the opposite side of the creek, surrounding it on the easterly, northerly and westerly sides. The general course of the creek is from the east, westerly, to the Hudson river.

Prior to the incorporation, in 1813, of the defendant, John Converse preceded it in possession, and thereafter was the principal manager of the incorporation, and his rights and interests were treated in this case as those of the defendant.

In 1809, Converse leased from David De Forest one and three-fourth acres (part of the seven acre lot), for twenty-one years, the nature and extent of which lease is fully discussed in the opinion of Judge WOODRUFF.

From about that time, Converse and the defendant have been in occupation of the excepted acre, and other land south of the creek, and on the trial, the defendant claimed to own the same. The only paper title produced, to the acre however, was a quit claim from Wm. P. Van Rensselaer to the defendant, in 1847. While Converse held this lease, a dam for the use of a shovel factory was erected, crossing from the excepted acre to what is now the plaintiffs' land (the seven

acre lot), and the shovel factory was erected on the excepted acre. What is called the gun factory lot is on the north side of the creek, above, and east of the seven acre lot of the plaintiffs, and this is also claimed by the defendant.

In 1817, the heirs of David De Forest leased to John Converse the seven acre lot (with the exception of the excepted acre) for the term of thirty-four years and nine months, ending the 1st day of February, 1852.

In 1839, the defendant then being in possession of the excepted acre, claiming to own it, and occupying the seven acre lot, under the lease to Converse, diverted the water of the kill or creek, from a point higher up, so as to use it in their manufacturing establishments, erected on the excepted acre, and restore it to the creek at a point below the lower or western boundary line of the seven acre lot. As a consequence, the water of the creek did not run in its natural channel at any part of its course between the seven acre lot and the excepted acre.

To make available the water thus diverted, the defendant, at about the time of the diversion, erected a water wheel, fifty feet in diameter, and other works, at an expense, sworn upon the trial to be nearly $100,000. The facts, as to the assent of De Forest, one of the plaintiffs' grantors, to this diversion (which the defendant claims are an estoppel) appear in the judge's finding below.

In 1850 and 1851, the defendant, still holding the lease of the seven acre lot, which was to expire in 1852, made further improvements upon the excepted acre, putting in a wheel sixty feet in diameter, and erecting other improvements, at a gross expense of nearly $100,000 more.

About four years after the expiration of the lease to Converse of the seven acre lot, the defendant continuing the diversion of the water, the plaintiffs, who had purchased the seven acre lot, brought this action.

The cause was first tried at Special Term, before Mr. Justice WRIGHT, who dismissed the complaint, and from his decision the plaintiffs appealed to the General Term, which ordered

a new trial.   This decision of the General Term is reported in 34 Barb., 485.   Upon a new trial, at the circuit, before Mr. Justice INGRAHAM, the complaint was again dismissed. At this trial, the justice made the following findings:

1. That the plaintiffs, by sundry conveyances, are the owners of the seven acre lot, as formerly owned by Defreest, under conveyances executed to them in 1852 and 1856, by the devisees of David Defreest.

2. That the defendants are the owners and are in possession of the reserved acre on the south side of the creek, and adjoining to the creek, and were in possession thereof prior to the plaintiffs' conveyances, under deed from Wm. Van Rensselaer, dated 1st February, 1847, having held the same previously, under lease from S. Van Rensselaer, dated 28th November, 1832.

3. That the boundary of the defendant's land is the creek.

4. That prior to 1839, all the water of the creek passed over the bed of the creek, excepting that which was used for the shovel factory, which was returned to the creek at or near the place from which it was taken.

5. That in 1817, the seven acre lot was leased by Defreest to Converse, for thirty-four years and nine months, and that such lease was afterwards, and until its expiration, held and owned by the defendant.

6. That, in or about the year 1839, the defendant commenced and completed an alteration in their works, by which alteration the greater part of the waters in the creek were taken, by means of a dam erected across the creek, above the lands of the plaintiffs, and were carried through an artificial channel, built on the defendant's land, to the defendant's works, and were not returned to the bed of the creek until they reached a point below the seven acre lot, and that such alteration was of a permanent character.

7. That the Defreests then owned the seven acre lot, but the same was leased to Converse, and such lease was held by the defendant; and that Abraham W. Defreest, acting for himself and the other owners, assented to the diversion, urged

the completion of the works intended for that purpose, and expressed his fears that. this defendant had not. the means to complete it.

8. That Defreest wished the completion of the works, from an expectation, on his part, of a large increase in population, in consequence of the increased works, and of a rise in the value of his property, from the increased demand therefor, which was communicated to Burden.

9. That, at the time, Defreest was informed of the nature of the improvements, and must have known their permanent. character, and resided in the vicinity of the works.

10. That there is no evidence to show that Defreest, down to the time of the conveyances to the plaintiffs, ever objected to the diversion of the waters by the defendant.

11. That, at the time of those conveyances, the diversion. of the waters to the defendant's works was in full force, and that such diversion was permanent.

12. That at the time. of those conveyances. to the plaintiffs, the defendant claimed the right to use the water as diverted to their works with the consent of Defreest, and that such claim was adverse to any supposed right of Defreest to have the waters returned to the bed of the creek along the line of the seven acre lot.

13. That the works of the defendant have been erected at large expense, and applied to the use of the water as diverted after the assent of Defreest thereto.

14. That a restoration of the water to the bed of the creek would require an alteration of the wheel and. other works connected therewith, at a large expense.

15. That the plaintiffs, or their grantors, have not, at any time since the expiration of the lease, had any means on the seven acre lot for the use of the water, if it had flowed through the bed of the creek.

16. That the fall of the creek, on the line of the seven acre lot, from the upper to the lower boundary of such land is. $5\frac{61}{100}$ feet, and would furnish a water power sufficient to run one run of stones, grinding 18 to 20 bushels per hour, or

a cotton mill with 40 looms, or what would be equal to about a 20 horse power.

17. That there have been no works requiring the use of the water on the plaintiffs' land (the seven acre lot), erected either by Defreest or the plaintiffs, and none now exist thereon.

18. That, since 1839, the waters diverted by the defendant, above the seven acre lot of the plaintiffs, have been returned to the creek at a point below the west line of the lot.

19. That the waters in the creek could be used for operation of works on the seven acre lot, by use of shafting, but that it is doubtful whether the whole power could be obtained, except by running a dam across the stream.

20. That there was, in 1822 and subsequently, a dam across the creek, by the shovel factory, about five feet high, which was removed about 1841 or 1842.

21. That, in 1851 or 1852, the defendant enlarged their works, building their large wheel of 60 feet diameter, and the water was then taken from the reservoir dam.

22. That, in order to alter the works so as to return the water to the creek at the place where it was formerly returned, the wheel must be raised $5\frac{1}{2}$ feet; that raising the wheel would reduce the velocity of the fall of the water over the wheel, and would also deprive the defendant of two feet of water in the reservoir, which they can now draw out of it.

As matter of law:

1. That the plaintiffs are the owners of the seven acre lot, on the north side of the creek, and that their title extends to the center of the creek.

2. That, as such owners, they are entitled to claim the flow of the water in the bed of the creek, along their land, to the same extent as it existed at the time of the conveyance to them by Defreest and others.

3. That the defendants are the owners of the reserved acre lying on the south side of the creek, and that their title extends to the center of the creek.

4. That at the time when the defendant diverted the water from the bed of the creek, the same was legally done, because

they owned the land on one side and held the lease on the other, and that such diversion was not an adverse possession, during the continuance of the lease.

5. That at the various times when the diversion took place, although the same was done under a parol license from the owner of the land, and with knowledge of its permanent character, the acts of the owner did not operate as an estoppel to' prevent him from claiming a restoration of the water after the termination of the lease.

6. That the diversion of the water from the bed of the creek having been made by the defendant in a permanent manner, and being held by them at the time of the conveyance to the plaintiffs, under a claim of right from the parol license of Defreest, the right to the flow of the water through the bed of the creek had ceased to be appurtenant to the seven acre lot, and the right to reclaim the same, and to compel the restoration of the water to the bed of the creek, did not pass to the plaintiffs under those conveyances.

7. That the defendant have acquired no title by adverse possession to the right to divert the water from the bed of the creek.

8. That the proprietors of the land on the north side of the creek have not lost any of their rights by non-user of the water.

9. That the acts of the former proprietors of the land on the north side of the creek amount to a relinquishment of their right to use such portion of the waters as were diverted above their land.

10. That where, in consequence of a parol license from the owner of the land on the north side of the creek, the defendants have executed such license in a permanent manner, and at a large expenditure of money, equity will not interfere to enable such owner or his grantees or assigns to violate his parol agreement, but will, on the other hand, enjoin an action at law, if brought for such purpose.

The plaintiffs again appealed to the General Term, which reversed the decision of the circuit and ordered a new trial.

This last decision is reported in 39 Barb., 311. From the order of the General Term it appeared that the reversal was upon questions of fact as well as of law. The defendant appealed to the Court of Appeals, from the order granting a new trial, giving the usual stipulation.

Upon the first argument in this court the court failed to agree upon a decision and a re-argument was had.

*William A. Beach*, for the appellant (*John H. Reynolds* with him).

*Amasa J. Parker* and *Charles E. Patterson*, for the respondent.

GROVER, J. It appears, from the order of the General Term, that the judgment was reversed upon questions both of fact and law. It is, therefore, the duty of this court to determine, whether the order was proper upon either ground. It was assumed, by the parties upon the trial, that Stephen Van Rensselaer was, prior to 1788, the owner of all the lands and water rights to be affected by the judgment rendered in the action. The plaintiffs deduced from him a paper title of seven acres of land to themselves, and proved that possession had been held, under this title, for a great number of years. This piece, together with other land, was conveyed by Van Rensselaer, by deed, to Jeremiah Lansing, in 1788. Lansing conveyed the piece, with other lands, to David Defreest, in 1789. The latter deed contains the following exception: "Excepting and always reserving one acre of land on the south side of the creek, and adjoining to the creek, where the line crosses said creek, unto Stephen Van Rensselaer, his heirs and assigns, forever." The acre intended to be excepted in the last deed, however located, was included in the deed from Van Rensselaer to Lansing. A paper title to the excepted acre was shown from Van Rensselaer to the defendant. It is insisted by the counsel for the plaintiff, that the defendant failed to show title to this acre, for the reason that Van Rens-

selaer, being a stranger to the deed from Lansing to Defreest, could acquire no title by an exception or reservation contained in that deed. This point is immaterial, as the plaintiffs showed no title whatever to this acre, and they must stand upon their own title unaided by the weakness of that of their adversary. It was proved that a stream of water, known as the Wynant's kill, ran through the seven acres, including the excepted acre, making an elbow on the south side, containing about one acre. Possession of this elbow, including the lands on the south side of the creek, has been held under the exception in the deed from Lansing to Defreest for a great number of years, and long enough to perfect a title by adverse possession. It is insisted by the counsel for the appellant, that this acre has been so located as to embrace the entire bed of the stream, and that the plaintiffs' land is bounded by the north bank. His argument, that the object of the exception was to secure the entire water power to Van Rensselaer, and that ownership of the entire stream is necessary for this purpose, rests upon no sufficient basis. It does not appear that such was the object of the exception. The counsel further insists, that it appears, that the excepted acre was so located, from a lease dated in February, 1809, from David Defreest to John Converse, then in possession of the lands now claimed by defendant on the south side of the creek, of a strip of land upon the north side of the creek. The description of the land leased is as follows: Beginning at a marked white oak tree, standing in the south line of the party of the first part on the north bank of the Wynant's kill, at the distance of twenty links from the water in the said kill; then giving various courses and distances to a black ash tree, marked and standing on the north bank of the Wynant's kill, at the distance of twenty-five links from the water in said kill; thence up the stream as it winds and turns to the place of beginning. This lease was for twenty-one years, and contained a covenant on the part of the lessee to enclose the premises, and a further covenant that he would not during the time, by means of a dam or other obstruction placed in the stream, cause the overflow of any

of the lands of the lessor. It is argued that the latter cove-
nant shows that the lessor was not the owner of any portion
of the creek, but I do not think such inference warranted
thereby. The lessee, in the absence of such covenant, would
have no right to overflow the lands of the lessor, and if the
lessee was the owner to the middle of the stream he might,
by placing obstructions in the stream, upon his own land,
cause the inundation of that of the lessor. On the 1st of
May, 1817, Abraham and John Defreest, who had succeeded
to the title of David, leased to John Converse, who was act-
ing in behalf of the defendant, the entire seven acres now
owned by the plaintiffs, by a description, also including the
excepted acre, together with the benefit and use of all falls
and water upon, running through, or adjoining the said pre-
mises, excepting the acre, in the precise language of the
exception in the deed from Lansing to Defreest (*supra*) for the
term of thirty-four years and nine months. Accepting this
lease was conclusive upon Converse and those for whom he
acted, that the excepted acre was wholly upon the south side
of the creek and extended no farther than the middle of the
stream. The defendant entered into possession and occupied
under this lease for the entire term. These facts show that
the defendant was bound to restore the land with the water
running in its natural channel, at the expiration of the lease,
unless relieved from such obligation by some immediate act
of the lessors, or of those holding their title. While in posses-
sion under this lease, in 1839, the defendant constructed an arti-
ficial channel for the stream, by which it was wholly diverted
from the seven acres, and conducted across the excepted acre,
and used upon, a large overshot wheel, constructed to ope-
rate the extensive machinery of the defendant. At this time
the plaintiffs were the owners of six acres upon the stream,
below the premises in question, upon which was extensive
machinery, operated by them, by means of the water power
of the creek, but having no interest in the seven acres. The
plaintiffs drew down their pond at this time, to enable the
defendant to excavate a tail race from its wheel to the bed of

the stream.   It is insisted by the defendant that this precludes the claim of the plaintiffs to have the stream restored to its natural channel, thereby causing a great loss to the defendant in respect to the operation of its machinery.   The answer to this is, that the plaintiffs base their claim to such restoration upon their title to the seven acres, which they obtained, in part, in 1852, and the residue in 1856, and that it was known to the defendant at the time that the plaintiffs then had no interest therein.   It was, therefore, not then in their power to affect any right appurtenant to the reversion in the seven acres, as against the then owners or those subsequently acquiring the title.   It is further insisted by the defendant, that Defreest, one of the defendant's lessors, was precluded from requiring the restoration of the stream, by his assent to its diversion at the time it was made in 1839, and that if his right was thus cut off, no grantee from him could assert, under his grant, any better right thereto than he had.   The conclusion is, doubtless, correct under the facts of this case, as the water was in fact diverted at the time Defreest conveyed to the plaintiffs.   This was sufficient to put the plaintiffs upon inquiry as to any right, legal or equitable, of the defendant to make the diversion.   Such inquiry would have led to information of the acts of Defreest, and the plaintiffs are, therefore, chargeable with notice of such acts.   They are not, therefore, to be regarded as *bona fide* purchasers in this respect, but take the land subject to any legal or equitable right of diversion the defendant had, as against Defreest.   It must, therefore, be determined what such right, if any, was as against the latter.   The case shows that Defreest lived at the time in the immediate vicinity, was frequently at the place while the work was in progress, conversed several times with the managing agent of the defendant, expressed to such agent his opinion that the change would improve the water power, and would benefit his property in the vicinity.   That he knew that the contemplated change and improvements would cause the expenditure of a large sum of money, and that while these large expenditures were being incurred, made no objection

to the diversion of the water. It is claimed that he must have known, from the amount of the expenditure and the character of the improvement that the diversion was designed to be permanent. The latter fact is strongly controverted by the plaintiff, but, in considering this question, I shall assume its truth. It is insisted by the defendants that these facts constitute an estoppel upon Defreest from asserting any claim to a restoration of the water to the prejudice of the defendant. The answer to this position is, that the defendant at the time had not only the possession of the seven acres, and the full control of the water belonging thereto, but, also, the right of possession and control for the unexpired term of the lease, a period of thirteen years, and that during that time Defreest had no right to object to any use of the stream by the defendant, except such as worked an injury to the reversion, which the diversion of the stream, during that period, clearly would not. That the defendant, at the time, knew that upon the expiration of the lease their right to divert the water would cease under it, just as well as Defreest did, and there was no pretense of any other claim by the defendant to any other right to divert the stream from the seven acres. The defendant was not, therefore, in any sense, misled or deceived as to its right by anything done or omitted by Defreest. The case does not, therefore, come within the principle of the class of cases cited by defendant's counsel, holding that when one, in the belief that he has title, makes improvements with the knowledge and encouragement of the owner, such owner shall be estopped from asserting his title to the prejudice of the party having made such improvements. The estoppel is based upon the fraudulent conduct of the owner. There is no such reason applicable to Defreest. He was not estopped, and it follows that the plaintiffs, as his grantees, are not. There is no pretense of an estoppel upon the co-tenants of Defreest, who are also grantees of the plaintiffs. It is insisted by the defendant, that the plaintiffs acquired no right to a restoration of the stream, under their deed, although such right existed in their grantors, for the

reason that the diversion was prior to the grant, and that the defendant was holding the stream adversely at the time. The land was at the time in the possession of the grantors. There is no question but the title to that passed by the grant to the plaintiffs, with everything incident or pertaining thereto. The right to the flow of the stream in its natural channel was an incident to the land. 3 Kent's Com., 439. 1st R. S., § 147, p. 739, declares that grants of land shall be void when such lands shall, at the time, be in the actual possession of another, claiming under a title adverse to that of the grantor. This applies to an adverse holding of land, and not to such holding of some right appurtenant thereto, which passes with the land. The purchaser of the land is entitled to such appurtenant rights. (*Mason* v. *Hill*, 4 Barn. & Adolphus.) It follows that the plaintiffs had the right to have the stream flow in its natural channel along the seven acres purchased by them. For a violation of this right by the defendant, they had a right of recovery, without proof of actual damage, irrespective of any use of the water power by them. (*Tyler* v. *Wilkison*, 4 Mason, 400; 3 Kent, 539; *Adams* v. *Burney*, 25 Vermont, 225; *Embury* v. *Owen*, 6 Exch., 368; *Townsend* v. *McDonald*, 2 Kernan, 381.) It follows, that the plaintiffs were entitled to recover damages of the defendant for the wrongful diversion of the stream. It may now be assumed as settled that the plaintiffs could, in the same action, obtain all the relief to which the facts entitled them, arising out of the diversion of the water, whether such relief was legal or equitable, or both. (Code, § 167.) They were clearly entitled to recover damages, and the judge, therefore, erred in dismissing the complaint, and the General Term were right in reversing the judgment and ordering a new trial. This leads to an affirmance of the order appealed from, and to final judgment against the defendant; but whether such judgment shall be for damages only, or in addition thereto, shall award a mandatory injunction for the restoration of the water to its natural channel, remains to be considered. It is urged by the defendant that the latter ought not to be included,

for various reasons, the principal of which are, that it would be productive of great injury to the defendant, and be of little benefit to the plaintiffs. The former fact is established by the evidence. The latter rests upon the hypothesis that, inasmuch as the plaintiffs have not heretofore used the power and have made no preparations to use it, they do not desire it for use. The facts show that its restoration would give a power sufficient for a grist-mill grinding fifteen bushels per hour, or a cotton factory with forty looms. The question then comes to this, whether the defendant, who has wrongfully diverted from the plaintiffs a stream affording such a water power, shall be permitted to continue such wrongful diversion, and thus to deprive the plaintiffs of what is clearly theirs without their assent, upon the ground simply that its restoration would be a great damage to it. In other words, that by its continuance wrongfully to appropriate to its own use the property of the plaintiffs, it derives a much greater benefit than the plaintiffs could by being restored to their own. The bare statement of the question would seem to suggest the only proper answer. The very idea of justice is to give to each one his due. The use of the natural flow of the stream is the due of the plaintiffs, and to justify withholding it from them requires some better reason than loss to the wrongdoer consequent upon its restoration. It is insisted that the equitable right of restoration has been lost by delay. The statute of limitation, either at law or in equity, has not attached so as to bar the right. The case has, therefore, no analogy to that class of cases where equity has refused relief upon the ground that the legal remedy was barred by the statute. The defendant has expended no money upon improvements since the expiration of the lease, consequently the principle of the cases holding that where, during the delay of a party in asserting his right, expenditures have been made in improvements, equity will not interfere, do not apply. *Lewis* v. *Chapman* (3 Beavan), is one of this class. The plaintiff sought to restrain, by injunction, the publication of a work of which he was the owner of a copy-right. It appeared that he had lain still for

six years and upwards and seen the defendant expending his money in printing the work, &c., &c.; upon this ground, equity refused to relieve the plaintiff. There are numerous cases of this description found in the books, but they all rest upon the same principle. All there is of the delay in this case is, that the plaintiffs finding the defendant using their water power have permitted it to continue such use for about four years. Clearly this indulgence furnishes no reason for the refusal of equity to aid the plaintiffs in the recovery of their legal rights. It is insisted by the defendant, that equity ought not to interpose in behalf of the plaintiffs, for the reason that they do not want the water power, afforded by the stream, for use. This is a mere assumption. It is true, they have not heretofore used the power, perhaps, for the very good reason that they have not had the ability to use it, on account of the defendants withholding it from them. It is said that the plaintiffs have erected no machinery for that purpose. This is true. The plaintiffs have not constructed machinery to rot while litigating with the defendant for the recovery of the stream. But if the facts claimed were clearly established, it would not protect the defendant in wrongfully withholding the stream. No man is justified in withholding property from the owner when required to surrender it, on the ground that he does not need its use. The plaintiffs may do what they will with their own. Upon established principles, this is a proper case of equity jurisdiction. First, upon the ground that the remedy at law is inadequate. The plaintiffs are entitled to the flow of the stream, in its natural channel. Legal remedies cannot restore it to them and secure them in the enjoyment of it. Hence the duty of a court of equity to interpose for the accomplishment of that result. A further ground requiring the interposition of equity is to avoid multiplicity of actions. If equity refuses its aid the only remedy of the plaintiffs, whose rights have been established, will be to commence suits from day to day, and thus endeavor to make it for the interest of the defendant to do justice by restoring the stream to its

channel.   If the plaintiffs have no other means of recovering their rights, there is a great defect in jurisprudence.   But there is no such defect.   The right of the plaintiffs to the equitable relief sought, is established by authority as well as principle.   ( *Webb* v. *The Portland Manufacturing Co.*, 3 Sumner, 190, and cases cited; *Tyler* v. *Wilkison*, 4 Mason, 400; *Townsend* v. *McDonald*, 2 Kernan, 381; 2 Story's Equity, §§ 901, 926–7; Angell on Water Courses, §§ 449–50.) It is further insisted by the defendant that equity will not interpose until the right has been settled at law.   That, formerly, was the universal rule, where there was any substantial doubt as to the legal right.   (*Gardner* v. *The Trustees of Newburgh*, 2 John. Chan., 162.)   But that rule no longer prevails in this State.   We have before seen that all the relief to which a party is entitled, arising from the same transaction, may, under the Code, be obtained in one suit.   Besides, there is no doubt as to the legal right in the present case. My conclusion is, that the plaintiffs are entitled to the aid of equity in restoring the stream to its natural channel, and this whether the loss to the defendant is more or less.   The defendant was bound to restore the stream upon the expiration of the lease, equally with the land.   The order appealed from should be affirmed, and final judgment given against the defendant for the damages sustained by plaintiffs, and that they restore the stream to its natural channel.   It is not important to determine, in this case, whether the plaintiff's boundary is the center of the stream, or the south bank; I have not, therefore, discussed that question.

WOODRUFF, J.   The title of the plaintiffs to the lands surrounding the bend of the Wynant's kill, on the northerly, easterly and westerly sides, through the conveyance from Abraham W. Defreest and others, under the deed from Jeremiah Lansing to David De Forest, is clearly established.

The boundaries of their land, as given in both of their conveyances, and also in the prior deed from Stephen Van Rensselaer, include all of the bend of the creek, and the one acre

within the bend, upon a portion of which the defendant's works are erected. The south line being a straight line, known as the south line of the David Defreest farm.

But in the deed from Jeremiah Lansing there is an exception of one acre, on the south side of the creek and adjoining to the creek, which I think is sufficiently identified as the said one acre within the bend. The lease by Abraham and John Defreest to John Converse, who occupied the shovel factory, identifies it, for within the bounds of the premises demised by that lease, there is no other acre which answers the description.

The exception in the deed of Jeremiah Lansing to Defreest was effectual to prevent the vesting of the title to that one acre in Defreest; and his devisees, in turn, except it from the conveyance to the plaintiffs.

Whatever land and right to the water remained in Jeremiah Lansing, upon and after his conveyance to Defreest, is now claimed by the present defendants. The description, in my judgment, left each of the owners, Lansing and Defreest, proprietors *ad filum aquæ.* The expression, lying on the south side of the creek and adjoining to the creek, has none of the specifications which the courts have sometimes regarded as confining a boundary to the bank of the stream; the land adjoins the creek. This makes the creek the boundary and not the bank or shore. Whenever the grantee is held limited by the bank or shore, or side of a stream, or one line of highway, it is because the bounds are expressed in terms to be such bank, shore, side or line, and the rule does not apply, when the land is described as running to the creek, stream or highway.

So that, if the question had arisen between Jeremiah Lansing and David Defreest, on and after the delivery of the deed to the latter, I have no hesitation in saying that each, by force of that conveyance, was entitled to the center of the kill or creek, and it is the title of David Defreest only which the plaintiffs hold.

That title, however, if not impaired by events subsequent

to the conveyance by Lansing to Defreest, gave them the clear and unquestionable legal right to have the water of the creek run in its proper channel, and to make such use of the water as they saw fit, and as is practicable, without interfering with the right of those who own the excepted acre, which was equally absolute and equally extensive.

To determine whether events, subsequent to the said deed from Lansing to Defreest, have affected or impaired this right of the plaintiffs, it may be useful to consider what is the title of the defendants to the one acre of land. Not because that title is now doubtful, nor because the right of the plaintiffs to the relief, which the plaintiffs seek, does not rest upon their own title, but because the history of the defendant's title may bear upon the alleged equity in their favor, forbidding that they should be subjected to heavy expense or loss. In the first place, they are, so far as appears by the evidence in this cause, without any *documentary title.*

The exception in the deed from Jeremiah Lansing to David Defreest, called also therein a reservation to Stephen Van Rensselaer, was wholly inoperative to vest in the latter any title. He had shortly before conveyed to Lansing the entire farm, without qualification or exception, and the reservation by Lansing, in his deed, did not re-vest any title in him. He was, to Lansing's conveyance, and to the land conveyed, a stranger.

I have already said that this clause operated as an exception, and the excepted land did not pass to Defreest. As a reservation it was inoperative. It did operate, however, as an exception. What relations existed between Lansing and Van Rensselaer, which induced Lansing to insert that clause in the deed with apparent intent that Van Rensselaer should enjoy the land, whether he had re-sold that acre, or was under agreement to reconvey, or why it was done, we can, at most, only conjecture. It must suffice to say, that there is no evidence in this case which warrants us in holding that, as a reservation in favor of the latter, it could have any legal operation.

It follows, therefore, that the subsequent lease from Stephen.

Van Rensselaer, dated November, 28th, 1832, to the defendant, if it purported to demise this one acre, was a demise from a person who had no title, *i. e.*, no title that appears in this case. In truth, this lease does not embrace the one acre, nor any part of it, nor any right or privilege of erecting a dam thereon. It simply demises the right and privilege of erecting and sustaining a dam where John Converse had erected and occupied a dam, under a demise from the said Van Rensselaer, within the bounds of the farm before leased by Van Rensselaer to William Norton, and to conduct the water therefrom, &c. The privilege here mentioned may, and probably does, refer to what is called the rolling mill dam, which was within the bounds of the Norton farm, but it was clearly not on the one acre.

Indeed this lease, so far from purporting to convey any privilege embraced within the one acre, rather indicates that Van Rensselaer himself was not conscious of having any pretense of title to the one acre, but himself understood and believed that Defreest owned the entire farm, which he had conveyed to Lansing, and was either ignorant of the exception, or deemed it inoperative. This appears in the fact that after leasing the privilege of erecting the dam on the Norton farm, he adds the privilege of conducting the water, by a raceway, from the dam, through the Norton farm *to the iron and nail factory* erected by John Converse, or which may be erected by the defendant *on the farm now or lately belonging to David Defreest.* The only iron and nail factory here referred to was, *in part*, on the excepted one acre and in part on the Norton farm before mentioned. This strongly indicates that Van Rensselaer claimed no title to this one acre, but deemed it a part of the farm "*belonging to David Defreest.*"

Again, as the reservation did not operate to re-vest the title to the one acre in Stephen Van Rensselaer, it follows that the deed of William P. Van Rensselaer, his devisee releasing all his right, title and interest, in 1847, conveyed to the defendants no title.

It is noticeable that even this deed is inaccurate in its reference to the subject, it purports to release one acre reserved in a conveyance by Stephen Van Rensselaer to Jeremiah Lansing. No conveyance by Stephen Van Rensselaer to Jeremiah Lansing is produced containing *any* reservation.

It is quite probable that, when this conveyance was taken, the absence of such reservation in Stephen Van Rensselaer's deed to Lansing was overlooked. Else the reservation to Stephen Van Rensselaer, in the deed of Lansing to Defreest, would have been referred to; or, perhaps, if well advised, the defendant would have sought a release from the heirs of Lansing, instead of the devisee of Van Rensselaer.

No other deeds, leases or conveyances, or other documents, are produced by the defendant, which purport to show any title in them to the one acre, of which they appear to be in the occupation. No conveyance, even from John Converse, is produced, vesting in the defendant any rights which, by possession or otherwise, it may be claimed he had acquired.

What, then, is the apparent foundation of the title?

According to the finding of the judge at Special Term, the defendant's title to the one acre within the bend is held under the conveyance from William P. Van Rensselaer, in 1847, they having previously held under his father's lease, made in 1832. I have already shown that the lease by the latter did not embrace the one acre, and the deed by the former did not convey it, because no title appears in him, which he could convey.

The first connection of either the defendant or John Converse with the one acre, so far as can be inferred from the findings of the judge, was in building or occupying the shovel factory dam, which he finds was across the creek at that factory in 1822.

At that time John Converse held a lease of the seven acre lot now belonging to the plaintiff for the term of thirty-four years and nine months, and dated in 1817, and the erection or continuance of the dam across the stream so far as it imparted or indicated a claim of right to the exclusive use or

appropriation of the water must, if it had no earlier begin
ning, be deemed under that lease.

But an examination of the evidence shows, I think, very
clearly, not only that that dam was erected by John Converse,
but that it was erected in 1813, prior to the lease last men-
tioned.   The view which was taken at Special Term, of the
effect of the diversion of the water in 1839, and of the acts
and assent of Abraham W. Defreest, rendered it unimpor-
tant by whom or at what precise date that dam was erected,
and hence no earlier date than 1822 was assigned to its exist-
ence.

The history of the holding of the one acre, and of the erec-
tion of dams at or near each end of the bend shown by the
evidence is this:

In 1809, John Converse, for some purpose not very dis-
tinctly apparent, leased for twenty-one years, from David
Defreest, one acre and three-quarters of land lying easterly of
the bend, and contiguous to the site of the rolling mill at the
point where the south line of the Defreest farm crossed the
creek, and embracing the land included in the seven acre tract
which lay east of the bend and between the creek and what
appears now to be the Greenbush highway, extending so far
to the north as the most northerly point or apex of the bend,
but with a qualification along the creek to be presently
noticed.

The lessor in this lease required a covenant that the lessee
will not erect, build, or make any dam or other obstruction
whereby the land of the lessor may be overflowed during the
term.

And in connection with that covenant, the qualification or
limitation of the boundary may be very significant; the land
on the west or creek side of the demised premises was not
bounded *by the creek*, nor by the water of the creek, but it
was, with apparent caution, made to run along and nearly
parallel with the creek, at a distance therefrom of twenty
links at one end and twenty-five links (over one rod) at the
other.   If the lessor designed to retain in his own possession

and control the one rod in width between the water of the creek and the demised premises, in order that the lessee should have no water privilege *by virtue thereof*, meaning only to demise upland and for upland purposes only, this boundary was appropriate.

The other evidence indicates that John Converse had erected, or contemplated erecting about that time, the rolling mill dam or some dam on the farm leased to Norton, and the covenant in favor of Defreest against any overflowing of his land was appropriate, since, as appears by the map and the testimony of Henry Burden, Defreest's farm extended easterly far beyond the demised premises up the creek, where is now the reservoir, and may have been liable to overflow from a dam built of undue height, and the retention of the one rod along the water of the east side of the bend, with a covenant by the lessee that his land should not be overflowed, is quite clearly no recognition of any right in Converse to erect a dam below, which would set the water back so as to overflow this one rod along the water.

So that it is clear, I think, that the lease of 1809 shows no right in Converse to erect the shovel factory dam across the stream at the west end of the bend.

Nevertheless, the proof shows, I think, by a very clear preponderance of the evidence, that John Converse, or Converse and Adams did erect the shovel factory dam, in the year 1813.

It is true, that Abraham W. Defreest is quite positive it was not built before the lease by himself and his brother, given in 1817, but after that lease. No doubt he testified sincerely, but other testimony makes it probable that, so far as the existence or making of a lease was referred to in his mind, as a test of the date, he must have confounded the lease given by his father, in 1809, with that given by himself and brother. Six witnesses give an earlier date to its existence, and some of them speak of their personal experience in that connection, so as, I think, to entitle them to belief. Williams is positive that the dam was in operation when he worked there, in 1816. Robinson worked there in January, 1815,

for Converse and Adams, and it had then been erected. Enearl knew the premises from 1809, and states that the dam was erected in 1813, during the war; Purcell says it was built between 1812 and 1815; Grazee says he knew the defendants' works in 1815, and the shovel factory dam was then erected; Grundy, who worked at the nail factory in 1814 and 1815, speaks of it as then there.

We have then, bearing directly upon the question of a right in John Converse, or Converse and Adams, to maintain a dam at the west end of the bend, and to the exclusive use and appropriation of all the water of the creek for manufacturing purposes, at that point, the first leading fact, that in 1813, they did erect a dam, extending across the creek, and did take the exclusive use of the water, for such purposes at that point.

Whether Converse, or Converse and Adams, were acting in this in any connection with the defendants, who, it appears, were incorporated in 1813, is not specifically proved. Both were associates, and, although no conveyance from them is produced, witnesses speak of the works as the defendants' works in 1815, and the whole evidence sufficiently indicates that whatever rights were acquired by Converse were treated as practically belonging to, or acquired for the defendants. Or, in another view, it may be said to be unimportant, since, if the right of exclusive use and appropriation was acquired by Converse, it was gone from the plaintiffs and their grantors. I therefore, in favor of the defendants, treat them and John Converse as identical, for the purpose of the question to be decided.

This fact then stands prominent, as above stated, that the shovel factory dam was erected and the exclusive use and appropriation of the water assumed in 1813. If that dam had been continued and that exclusive use enjoyed from that time onward, until the diversion of the water, in 1839, unaffected by other events, it would have been clearly adverse to the owners of the Defreest farm, on the northerly, easterly and westerly side of the bend, so that they could

not have asserted a right to a dam, or to draw the water therefrom for manufacturing purposes, in any interference therewith. But to establish a right by adverse holding and use, such holding and use must be continuous, and in continued hostility to the adverse party.

Here Converse, having occupied four years or thereabouts, accepted a lease from Abraham and John Defreest, in 1817, for thirty-four years and nine months, of all the land around the bend, together with the benefit and use of all falls and water adjoining thereto—a clear recognition of the lessor's interest in such falls and in that water, though perhaps not necessarily an admission that the falls and the water of the full width of the creek were *exclusively* his; but this is very significant, since, if the whole creek belonged to the owner of the one acre, there was no occasion to take a lease of it from the Defreests. So all right in the lessors to object to this continuance of the dam across to their side of the stream, to object to the setting back of the water, or to use the water themselves, was quieted; and so far as this erection and appropriation had theretofore been an infringement of their rights, it was thenceforward in subordination thereto. It is not improbable that securing this exclusive control and use of the water, was one of the inducements leading Converse to obtain the lease.

It follows that down to February 1st, 1852, there was no adverse occupation and use which impaired in any degree the right of the Defreests, or which gave to Converse or the defendants any right to maintain the shovel factory dam, or to appropriate the water after the expiration of that lease.

It seems unquestionable, that in respect to the one acre of land there was such an exclusive possession that the defendants should be assumed to have title thereto. But that settles nothing as to the right to divert the water, and the history of the defendants' title and use has been adverted to only for the purpose of ascertaining the nature and extent of their interest in the water of the creek, and for their proper influence and bearing upon their equitable claim to be pro-

tected in the enjoyment of the erections which they have made, and to turn the plaintiffs over to redress in damages only.

The result is this : The defendants, in 1839, having acquired no right to divert the water, except by the lease under which they then had exclusive possession, withdrew the water from its natural channel. At the expiration of the lease, the lessors had a clear legal right to the possession of the premises, and to have and enjoy the benefits resulting from the flow of the water in its natural channel. The full restoration of the property in its former condition was contemplated when the lease was given, and the lessees were allowed six months after the expiration of the term to pull down and remove any houses, mills or other buildings or machines on the demised premises. This right extended the term for the purposes of the privilege to August 1st, 1852.

I find, therefore, nothing in the case affecting the legal right of the plaintiffs, when this action was commenced, or of their grantors to have this water restored to its natural channel, unless it be that in violation of the rights of the plaintiffs and those grantors, the diversion had been continued five or six years. The date of the commencement of the action is not furnished us, but it appears by the proceedings at Special Term, on the first trial, that it was tried before April 13, 1858.

Five or six years appropriation cannot be claimed to give any adverse right. And in point of law, therefore, they fail to establish a defence to the action.

I concur fully with the General Term, that the conversations with Abraham Defreest, while the defendants were making their improvements, do not estop his co-grantors or the plaintiffs. Indeed, I think they do not estop him. The improvements did not then impair or infringe any right of his, and it is not at all clear, upon the evidence, that he intended to waive his right to a return of the water to the channel, or that he supposed he was so understood. And I am not at all satisfied that the defendant acted, in making the

improvements, upon the idea that his consent was necessary, or that it had been given, so as to authorize them to act thereon, and I greatly doubt that the idea of asking his permission ever occurred to the defendant. Had they deemed it of any importance, they would have sought it and the permission of his co-owners in a form, which would be authentic and available for their protection after the lease had expired.

So I agree with the General Term, that the right to have the water returned to the channel was not an easement, and severed from the freehold ; it was a right incident to the ownership of the fee in and adjoining the bed of the stream, and passed with it to the plaintiffs.

The defendants, as they appear upon the case, are intruders upon the one acre on the south side of the bend, without right or title.

They have occupied that one acre until by adverse possession they have, or are to be deemed to have title.

They very early seized upon and appropriated the water of the bend, building a dam across, to and upon the land of plaintiffs in like manner without right or title, and then took a lease which precludes all claim that their possession was thereafter adverse.

During the tenancy they diverted the water, and at the end of the term, they have not returned it to its proper channel.

For five or six years they have continued to appropriate it to their exclusive use, in clear violation, I think, of the legal rights of the plaintiffs and their grantors.

On what grounds, equitable in their nature, can the plaintiffs' legal rights be denied ?

1st. I have already said that in my judgment the loose conversations testified by Henry Burden, the defendants' agent, had, as he says, with Abraham W. Defreest in 1838 and 1839, are not sufficient to amount to a license or create an estoppel operative upon him, and still less upon his co-owners, on whose behalf he is not shown to have any authority, except to collect the rent reserved by the lease.

2d. There remains this consideration, viz : That during the

continuance of the thirty-four years' lease, the defendants did divert the water and so adapted their works to its use, that it would cost them a considerable sum to return the water to its original channel without materially impairing the efficiency of their water power.

I am aware that the court, at Special Term, finds that the defendants enlarged their water wheel to a diameter of sixty feet, in "1851 or 1852," leaving it doubtful whether it was before or after the expiration of the lease; but the agent of the defendants, under whose immediate direction it was done, or, to use his own mode of expressing his agency, who made the change, says he did it in 1850 and 1851, and it is the distinct assumption of the defendants' counsel on this argument that it was done in 1850. It, therefore, is not the case of a plaintiff lying by, when his legal right is invaded, and permitting his adversary to expend large sums of money in valuable improvements, and then invoking the aid of a court of equity to enforce his legal right, at a great loss or sacrifice by the defendant, resulting from the plaintiff's delay, of which examples are cited in the opinion on the former argument. These improvements were voluntarily made during the time when there was neither right nor motive to object thereto.

Now it is not denied that, had the works of the defendants remained as constructed in 1839, and with the fifty feet wheel then or thereafter put in, the water could be returned to its natural channel without seriously impairing the efficiency of the power as then enjoyed, and at a moderate expense. (And this is no unimportant consideration connected with the alleged acquiescence of Abraham W. Defreest in the construction of those works.)

But, just before the lease expires, the defendants voluntarily change their wheel and make such changes in their works as will render the restoration of the water more expensive, and the water power less efficient than it now is.

How does that concern the plaintiffs? How ought it in equity to affect the plaintiffs? The water power will remain just as useful and just as efficient as it ought to be. The

defendants will have all the height, or fall of water, to which they are entitled. Surely no equity arises in favor of the defendants to have the water run, where it now runs, in their exclusive appropriation, merely because they have taken it. The opinion pronounced on the former argument, rests mainly on the assumption that these expensive changes were made since the expiration of the lease, and that the plaintiffs have unreasonably delayed, and so encouraged the defendants to place themselves in this position. The proof, as I have stated, is to the contrary, and it comes from the defendants' agent, who made the improvements, and the defendants' counsel fixes in his brief 1850 as the time.

Should the cost of the required alteration affect the plaintiffs? On the question of amount, as well as also upon the question of efficiency after the alteration, the testimony is greatly conflicting, but let the cost be assumed, notwithstanding a good deal of testimony in conflict therewith, at the sum, or within the range found by the court, from $10,000 to $15,000. The question comes to this: May a tenant, at the expiration of his lease, refuse to restore the lessor to his rights on the ground that it will, in consequence of contiguous or neighboring improvements made by him during the term, cost him $10,000 or $15,000 to do so?

Will a court of equity entertain such an excuse? I apprehend not. It would be a novel and, I think, a most extraordinary view of the equity of a party to say, that the tenant of a mill stream may, during the term, make such erections as will make it highly inconvenient and greatly expensive to restore the premises to his landlord, and on that ground he shall be excused, and a court of equity shall permit him to retain the possession, though his lease has expired, and give to his landlord such remedy for his damages as the law will award him.

As this case is presented upon all the proofs, it seems to me to present that naked question, and to state it is, I think, to suggest the answer: Such facts constitute no defense.

To illustrate this a little further: To restore the water now requires no other alterations, so far as I can perceive, than

would have been required in August, 1852, when the defendants' privileges, under the lease of 1817, wholly ceased.

Now suppose the lessors had brought this action in September, 1852. Would it be claimed that, on the mere ground that it would cost $10,000 or $15,000, the defendants ought not to be restrained from longer diverting the water? I think, not. Doubtless their duty to restore it would have been resisted on the various other claims to the legal right, or denial of the plaintiffs' right, or on the ground of estoppel, but those being disposed of, the proposition that, because the tenant had seen fit during the term, and just before and at the very eve of its expiration, to put in a sixty feet wheel, could not, I think, have been successfully urged to defeat the plaintiffs' legal right.

I have treated of this right to the restoration of the water as involving only the question of its exclusive appropriation for manufacturing purposes. The legal right of the plaintiffs is just as clear, if it be useful for them in its natural channel for any other purpose; but the case on the part of the plaintiffs was tried on the assertion of injury to them in depriving them of the right to a dam of some sort at the west end of the bend of the creek. If it was clear that the restoration of the water was of no value to them, the case would not call for equitable interference. We cannot, however, say that the case so stands upon the evidence. Whether entitled to a dam across the stream or a wing dam, the proof is that they can make it available as a water power, and for the reasons above given I am constrained to conclude that their right is established, and no sufficient equity in the defendants' favor to justify the court in refusing to award to them relief.

If in this review of the position of the defendant, in relation to these premises, there is any misapprehension in regard to their title or its history, and in truth they hold any other rights than I have conceded to them, I very much regret that they did not put in evidence the leases or conveyances, if any there are, which would show that their rights or their acts have been misapprehended.

My conclusion is that the order of the General Term must be affirmed.

MURRAY, J., also read an opinion for affirmance, but for limiting the plaintiffs' recovery to damages, and releasing the defendant from its stipulation for judgment absolute in case of affirmance, and for ordering a new trial. He thought the circumstances of great loss and injury to the defendant, and slight advantage to the plaintiffs from a restoration, the assent of the plaintiffs's grantor to the building, by the defendant, of these permanent and expensive works during the lease, and the delay of the plaintiffs, after the expiration of lease, to bring suit, rendered an injunction improper.

HUNT, Ch. J., LOTT and DANIELS, JJ., concurred with GROVER and WOODRUFF, JJ., for affirmance and an injunction. DANIELS, J., was also inclined to the opinion that the plaintiff had established a title to the whole bed of the stream. MASON and JAMES, JJ., concurred with MURRAY, J., against an injunction.

Order of General Term affirmed and judgment final ordered for the plaintiffs for damages to be assessed, and a mandatory injunction that the defendant restore the water, within twelve months from the entry of judgment.