Vansickle v. Haines.

PETER W. VANSICKLE, Respondent, v. JAMES W. HAINES et als., Appellants.

Diversion of Water on Public Land Confers no Right Against Government. Where a person diverted and appropriated the waters of a creek on public land from its natural channel; and afterwards the land, on which its natural channel was situated, was patented to another : *Held*, that the former acquired no right against the government; and that the patent carried all the right of the government, which was absolute and unincumbered by any diversion or appropriation, to the patentee.

No Presumption of Grant Against Government. The diversion and appropriation of the water of a creek on the public land gives rise to no presumption of a grant as against the government; and, except in cases specially provided for, no statute of limitation runs against it.

Patent to Land Passes Unincumbered Fee of Soil and Incidents. A patent to land from the United States passes to the patentee the unincumbered fee of the soil, with all its incidents and appurtenances, among which is the right to the benefit of all streams of water which naturally flow through it.

Right to Natural Flow of Water not Affected by Question of Use. The right of the owner of the soil to the natural flow of a stream of water through his land, is not affected by the question as to what use he will put it to.

Absolute Ownership by United States of Public Land and Water—Patents. The United States has an absolute and perfect title to, and the unqualified right of property in, the public land; and, as running water is an incident to or part of the soil over which it naturally flows, a patent carries not only the land but the stream naturally flowing through it, and the same right to its use or to recover for a diversion of it, as the United States or any other absolute owner could have.

Right of Land Owner to Natural Flow of Water Through It. The owner of land over which a stream of water naturally flows, has a right to the benefits which the stream affords, independently of any particular use ; that is, he has an absolute and complete right to the flow of the water in its natural channel, and the right to make such use of the water, when he chooses, as will not damage others located on the same, stream and entitled to equal rights' with himself.

Effect of Utah Territorial Legislation as to Public Land. Before the United States can be held bound by the acts of the territorial legislature of Utah as to the public land, it must appear that such legislation was submitted to congress and not disapproved by it.

Construction of Grants of Government. Grants by the government must always be construed most favorably to the government ; they pass nothing by implication.

Utah Laws as to Diversion of Water. The law of Utah Territory respect-

17

Vansickle *v.* Haines.

ing the grant of water rights, (Com. Laws Utah, 12, Sec. 38) purported to authorize the county court to grant a right to divert water, but did not purport to authorize any individual to make such diversion without the sanction of the court.

UTAH LAW AS TO INFRINGEMENT OF WATER RIGHT. The law of Utah Territory respecting infringements upon water rights, (Com. Laws Utah, 155, Sec. 7) granted no right of any kind to divert water, but simply provided a punishment for the violation of rights supposed already to exist.

UTAH TERRITORY COULD NOT CONFER RIGHTS TO WATER ON PUBLIC LAND. Under the act of congress organizing the territory of Utah, which provided that the territorial legislature should pass no law interfering with the primary disposal of the soil, no act of the legislature would have been valid that in any way attempted to confer any right to the water of the streams on the public lands.

CONGRESSIONAL LEGISLATION AS TO DIVERSION OF WATER ON PUBLIC LAND. It appears from the act of congress of July, 1866, which seems to have been adopted simply to protect those who at that time were diverting water from its natural channels on the public land, that no diversion had previously been authorized.

PREËMPTIONER ON ONE QUARTER SECTION HAS NO RIGHT TO DIVERT WATER FROM ANOTHER. A preëmptioner, while occupying and improving a quarter section of the public land, has no right to enter upon another quarter section, to which he makes no claim, and divert from it a valuable stream of water for the benefit of the land which he is claiming.

RIGHT OF PATENTEE TO HAVE DIVERTED WATER RETURNED TO NATURAL CHANNEL. A patent to land from the United States, (previous to the act of congress of July, 1866) carried with it a stream naturally running through such land as an incident thereto, together with the right to have it returned to its channel, if diverted.

NATURE OF PRESUMPTION ARISING FROM ADVERSE HOLDING. The presumption arising from adverse holding or user for the period prescribed by the statute of limitations, is not a presumption of a grant against any particular person, but against the *title* under which he holds.

TITLE BY PATENT WIPES OUT ALL FORMER TITLES. Where a person acquires a United States patent to land, he acquires a new title, against which there is no prescription ; in other words, his patent sweeps away all former titles, and confers upon him as complete a title as the United States had.

*PRESUMPTION RESPECTING ADVERSE USER OF WATER SAME AS OF LAND.* The presumption respecting the adverse user of water stands upon the same footing as that respecting the adverse-user of land ; and the reasoning which will sustain the one will likewise uphold the other.

ADVERSE USER OF WATER ON PUBLIC LAND CANNOT BE SET UP AGAINST PATENTEE. The time during which a person diverts water from public land previous to the issue of the patent, cannot be set up as an adverse user against the patentee.

ADOPTION ·OF THE COMMON LAW. The territorial statute adopting the common law of England (Stats. 1861, 1) was adopted by the state constitution (Con. Schedule, Sec. 2).

RIGHTS OF RIPARIAN PROPRIETORS ON NON-NAVIGABLE STREAMS. The common law rule as to running water allows all riparian proprietors to use it in any manner not incompatible with the rights of others; so that no one can absolutely divert all the water of a stream, but must use it in such a manner as not to injure those below him.

"PRIOR APPROPRIATION" OF WATER NOT AVAILABLE AGAINST TITLE TO SOIL. The early decisions of this state and those of California, holding that priority of appropriation gave a right to the use of water, were made in cases where there was no title to the soil, and have no bearing in cases where absoluet title has been acquired.

APPEAL from the District Court of the Second Judicial District, Douglas County.

It appears that in 1857, the plaintiff Vansickle diverted, by a ditch for irrigating and domestic purposes, one-fourth of the water of Daggett creek, a small tributary of the Carson river in Douglas County. He made the diversion at a point then on the public land, but which in 1864 was patented by the United States to the defendant Haines. In 1865, Vansickle obtained a patent for his own land where he used the water. In the fall of 1867, Haines and his co-defendants, William F. Leet and Charles Vangordor, constructed a wood flume on Haines' land, and turned into it all the water of the stream, thereby depriving the plaintiff of that part of it which he had been using. In November, 1870, plaintiff commenced this action, asking for $1,500 damages and an injunction to restrain further diversion of that portion of Daggett creek claimed to have been appropriated by him. There was a decree for plaintiff substantially as prayed for, from which defendants took this appeal.

·R. S. Mesick, for Appellants.

I. Prior to the patent to Haines, the land at the point of diversion of Daggett creek was a part of the public domain, and belonged to the United States government. It cannot be claimed that the government lost any part of its estate under any statute of limitation, for as against the United States the statute of limitations was inoperative. Angell on Lim., Sec. 39; Washb. on Real Prop.,

Book III; Chap. II, Sec. 7, §§ 38, 42; 6 Pet. 666; 20 Geo. 467. Nor could any prescriptive right as against the government be inferred, for the reason that no inference of a grant can be indulged in such case.

II. Prior to 1866, there was no law of the United States by which an easement in such land, separate from the land itself, could be carved out of the estate of the government and granted. Therefore, no presumption of a grant of any such easement, separate from the land, can be indulged.

III. The title conveyed by the patent to Haines was a full and absolute title to the land and to the water flowing over it, and it was sufficient to exclude all private persons from the land and from diverting water from it. The owner in fee of land has the title to and control over water naturally flowing over it, to the same extent and in the same sense as he has to and over the soil itself. 1 Coke upon Litt. 4 a; Cooley's Black. Com., Book II, Chap. II, and note 4; Elliott v. Fitchburg R. R. Co., 10 Cush. 193; Angell on Water-courses, Sec. 5, and authorities cited in note 3, Secs. 10, 12, 132; Washb. on Real Prop., Book II, Chap. I, Sec. 3, § 40; Washb. on Easements, 270, 274, 281; 1 Brightly's Dig. 500, Sec. 232.

IV. The right which is awarded to the plaintiff by the judgment is plainly an easement in the real estate of Haines, lying wholly in *grant* and not at all in *livery*. Washb. on Real Prop., Book II, Chap. I, Sec. 3, §§ 1–5.

V. Had the patent to plaintiff been made while the land of Haines was public land, no easement in such land in favor of plaintiff would have passed by the grant; and much less can such right be held to have passed to him by the grant of the government made subsequent to the patent of Haines. That such right would not have passed to plaintiff under the grant to him, had the land of Haines at the time been public land, is well settled. *Wilcoxon* v. *McGhee*, 12 Ill. 381; *Tabor* v. *Bradley*, 18 N. Y. 109.

VI. The plaintiff was in the attitude of a trespasser when the grant was made to Haines, and the government cannot be presumed

to have intended to burthen the estate of a purchaser for the bene-
fit of a trespasser.    Nor can it be presumed even that the govern-
ment was aware that the Haines tract was in any way tributary to
the Vansickle tract at the time of the grant to Haines.

*Robert M. Clarke*, for Respondent.

I. The rights of Haines as a riparian proprietor do not constitute
a property in the corpus of the water, but a right to the use of it
for his natural wants as it flows in the bed of the stream.    *Mason*
v. *Hill*, 5 Barn. & Ad. 1 ; *Pugh* v. *Wheeler*, 2 Dev. & B. 50 ;
*Howell* v. *McCoy*, 3 Rawle, 256 ; *Thomas* v. *Bruckney*, 17 Barb.
654 ; 1 Sim. & S. 190 ; 4 Mason, 397 ; 50 Me. 604 ; 2 Allen,
287 ; 35 N. Y. 524.

II. Whatever may have been the abstract rights of Haines as a
riparian proprietor, they are distinct from those of Haines, Leet, and
Vangordor, as appropriators.    Though Haines, as riparian propri-
etor, might have the right to use so much of the water as was
necessary or proper to satisfy his natural wants, including the irri-
gation of his land, still it follows, both upon principle and authority,
(there being no property in the water and no estate except in its
use, and this use being fully supplied) that Vansickle could law-
fully appropriate the surplus after Haines' natural wants were sup-
plied, and that such appropriation, even if not of right, is, as to
Haines, *damnum absque injuria*, and as to Haines, Leet, and Van-
gordor, as appropriators, first in time and therefore superior in
right.    *Tyler* v. *Wilkinson*, 4 Mason, 397 ; *Elliott* v. *Fitchburg
R. R. Co.*, 10 Cush. 191 ; *Cary* v. *Daniels*, 5 Met. 239 ; 11
Met. 281 ; 8 Penn. 22.

III. By all the authorities, ancient as well as modern, the only
estate or interest that can be acquired in flowing water is in its
use—a usufruct.    There can be no property in, or title to, the
corpus of the water.    2 Black. Com. 18 ; *Liggins* v. *Inge*, 7 Bing.
692 ; *Tyler* v. *Wilkinson*, 4 Mason, 397 ; *Embrey* v. *Owen*, 6
Exch. 333 ; 3 Kent, 439 ; *Kidd* v. *Laird*, 15 Cal. 161 ; *Mayor*
v. *Commissioners of Spring Garden*, 7 Penn. State, (Burr) 363.

IV. As the complaint is for abstracting a part only of the water

customarily flowing in the stream, and as there is left sufficient to answer the purposes and satisfy the wants of the riparian owner, no right is violated nor injury sustained; no wrong is done which will support an action, either at law or in equity. Washburne on Easements, 295; *Elliott* v. *Fitchburg R. R. Co.*, 10 Cushing, 191; *Howell* v. *McCoy*, 3 Rawle, 256; *Shreve* v. *Voorhees*, 2 Green Ch. 25; *Thompson* v. *Crocker*, 9 Pick. 59; 5 Ohio, 320; 17 Conn. 288; 6 Exch. 353; *Wadsworth* v. *Tillotson*, 15 Conn. 366; 51 Maine, 290; 10 Barb. 518.

Unless the doctrine herein maintained be correct, there is necessarily an end to the appropriation of water, or to the use of it for irrigation, or indeed for any purpose whereby the flow is impeded or the quantity diminished; for each riparian proprietor could insist upon the uninterrupted and undiminished flow in the bed of the stream, and by this means prevent any valuable use.

V. A usufruct in running water may be acquired by appropriation or occupancy, and our legislature gives powerful support to the doctrine. Stats. 1861, 87, Sec. 146; Stats. 1862, 107; Stats. 1864–5, 348; Stats. 1866, 202; Stats. 1869, 129. This legislation is a full recognition of the rights of appropriation by diversion, and is wholly inconsistent with the theory of a property in running water distinct from its use.

VI. The land under the water of Daggett creek passes by patent, just as does the land under the Ohio river; but the water flowing over the surface is in no manner affected by the patent, no more than the air passing over, or light illuminating the surface. This is *publici juris, res communis*, the property of no one, free to all; and not being property, constituting no part of the land, no right to or estate in it. It cannot be claimed that the government has a property in the water of an unnavigable stream, or that such property passes by patent in such manner as to vest, not only the stream in its then condition, but also to cut off, by relation, rights previously acquired by actual appropriation and use.

VII. The Mexican Mill company, as long ago as 1861, at an expense of hundreds of thousands of dollars, put a dam into the Carson river, constructed a canal four miles in length, and erected a mill, the machinery of which is propelled by the power of the

stream.    Can it be possible no rights have resulted from this appro-
priation and *use* that may not be overthrown by Jones, who, since
the diversion, and only yesterday, acquired patent to the hundred
and sixty acres contiguous to the river and immediately below the
dam, and this without respect to his necessities as a riparian owner?
May he, without requiring the water, or even by erecting a mill
and thus creating a necessity for the use, defeat the appropriation
and destroy the use acquired by the Mexican company?    Unless
consequences like these are to be sanctioned; unless all rights of
appropriation are to be overthrown; unless the basis upon which
rest the most extensive and valuable property interests in this state
is to be razed, the rights of the plaintiff must be sanctioned and the
pretenses of defendants denied.

VIII.  But Haines is cut off from making the defense interposed
by the statute of limitations and by adverse possession for more
than five years, and the presumption of grant resulting from such
adverse possession.    Stats. 1867, 185, Sec. 3 ; *Arrington* v. *Lis-
com*, 34 Cal. 365 ; *Grattan* v. *Wiggins*, 23 Cal. 36 ; 1 Burr,
119 ; 2 Black, 605 ; 31 Maine, 384 ; Washburne on Easements,
101–105 ; Angell on Water-courses, Sec. 204.

*R. S. Mesick*, for Appellants, in reply.

I.  No prescriptive right or implications of grant in plaintiff's fa-
vor from Haines can arise, because plaintiff could not have enjoyed
the right for the period of five years from the date of the grant by
the United States to Haines.

II.  A riparian owner is entitled to have a stream flow in its
natural channel through his land, whether he has any use for the
water or not.    This right is an incident of his estate in the land.
*Corning* v. *Troy Iron and Nail Factory*, 40 N. Y. 191.

By the Court, WHITMAN, J.:

Respondent claims damages against appellants for past diversion
of the waters of Daggett creek, and prays an injunction against
further continuance of the injury alleged.    The district court found
for respondent; hence this appeal.    Many questions are argued in

the briefs of respective counsel, which it is believed are not perti-
nent to the controlling question involved.

The district court finds that the water-course in question, a small
non-navigable stream, nowhere in its natural channel runs over the
land of respondent; but does so run through the land of appellant
Haines. It is also found that the respondent and Haines are the
owners in fee of their respective lands, by patents from the govern-
ment of the United States, that of Haines bearing date December
28th, 1864; that at such date, and long prior thereto, respondent
had appropriated and diverted from the natural channel of the
creek, for his necessary purposes, a portion of its waters, which
appropriation was interfered with by appellants in December, 1867;
and that since that time they have used all or nearly all of the
waters of the creek, in a flume constructed and worked by them
jointly for running wood. The court concludes that respondent ac-
quired such a right by his appropriation, as should be protected in
equity.

He acquired no right against Haines prior to the date of the lat-
ter's patent which could affect that grant, because there was no
title in Haines to be affected by acts of the respondent. He could
acquire no right against the United States, for as to that govern-
ment he was a trespasser, in that he diverted water from its land
not sought to be preëmpted by him. No presumption of grant
arises against the sovereign, and no statute of limitation runs, save
in some excepted instances, of which this is not one.

The government of the United States then had, at the date of
its patent to Haines, the unincumbered fee of the soil, its incidents
and appurtenances; that was passed to Haines, there being no
reservation in his patent, and none is suggested. He became the
owner of the soil, and as incident thereto had the right to the
benefit to be derived from the flow of the water therethrough; and
no one could lawfully divert it against his consent. What use he
made of it, so that such use did not interfere with the adjoining
riparian proprietors, was for him to elect. He had precisely the
same right to use it for his flume as for his household, his cattle, or
his land.

In this case, it is urged that such use is beyond riparian' rights.

In a recent case in New York, an objection precisely contrary was made, and the reply of the court is a complete answer to either and both: "It is insisted by the defendant that equity ought not to interfere in behalf of the plaintiffs, for the reason that they do not want the water-power afforded by the stream for use. This is a mere assumption.   *        *        *        *        *        *
But if the facts claimed were clearly established, it would not protect the defendant in wrongfully withholding the stream. No man is justified in withholding property from the owner, when required to surrender it, on the ground that he does need its use. The plaintiffs may do what they will with their own." *Corning* v. *Troy Iron and Nail Factory,* 40 N. Y. 206. From the facts found, it follows that appellant Haines, owner of the soil, has the right to the flow of the water of Daggett creek in its natural channel; what use he may make of it when there is beside the question, so far as respondent is concerned. The right of Haines protects his coäppellants. The decree of the district court is reversed, and the cause remanded, with instruction to enter a decree for appellants.

---

After the rendition of the foregoing decision, a petition for rehearing was presented; in response to which the following opinion was filed at the January term, 1872:

By the Court, LEWIS, C. J.:

When this case was originally before us, we gave it the most anxious and thorough consideration, and were drawn to the conclusion at which we arrived by an uniform current of decisions, the correctness of which has never been questioned — by rules as well established as any in the books, and the logic of principles which have become maxims in the law. Still, although no new point is suggested, we are asked to grant a rehearing, upon the assurance in the outset that it is asked only upon the strongest conviction that our error is demonstrable. The argument presented, however, falls far short of satisfying the expectations thus awakened.

We are also unable to understand from the petition what exact

condition is assigned to running water in the catalogue of rights or property; or what the nature of the title which may be acquired to it, if any. Much thereof is devoted to showing that there can be no property in running water; that it is and of necessity must remain common to all; that it is a thing " the property of which belongs to no person, but the use to all"; and in the same sentence it is said that it "is *publici juris, res communis* and *bonum vacans.*" This *abandon* in the use of legal expressions is evidently the result of a radical misunderstanding of the signification which is given to them in the books of law. True, it is often said that water is *publici juris,* or belongs to those things which are *res communis;* but how it can be either *publici juris* or *res communes* and also *bonum vacans* is a problem not yet solved in the science of the law. If common property, or, as argued by counsel, something in which no one has an absolute property, but every one has the use; the right to the use certainly must then be in the community: but *bonum vacans* is property without an owner of any kind, and which belongs absolutely to the person who may first find or appropriate it, and he has the complete right of property in it as against the world, except the real owner. It is a flat contradiction in terms, to say that running water is at the same time common property and *bonum vacans.* But we have the word of Lord Denman, in *Mason* v. *Hill,* 5 Barn. & Adolph. 22, and of Baron Park in *Embry* v. *Owen's Ex.,* that it was never considered *bonum vacans.* Nor are these contradictions confined simply to legal terms. The argument proceeds upon the assumption that running water belongs to the community generally, and authorities are cited which are supposed to sustain that doctrine, as the quotation from Blackstone, who says: " Water flowing is *publici juris.* By the Roman law, water, light and air were *res communes,* and which were defined, things the property of which belongs to no person, but the use to all." Yet, after arguing to show that water is common property, it is also claimed that a stream may be absolutely appropriated by the first person who may wish to use it. In other words, that water, instead of being something which belongs to all in common, as is argued at first, is a thing which belongs absolutely to him who first appropriates it, to the extent even, that if it be

necessary for the purpose for which the appropriation is made, it may be completely consumed. Surely, the two propositions are as irreconcilably contradictory as any that can be named. As an illustration, it is argued that running water is like the air, to which certainly all have an equal right, and with which no one has the right to interfere to the injury of another. But in this case the right is claimed by Vansickle to deprive the appellant of the stream, which in the ordinary course of things he would be enabled to enjoy, and to appropriate it exclusively to himself. If running water be like the air, then surely no one has the right to interfere with it in its natural state to the prejudice of others. When positions so utterly contradictory are assumed, the real questions in the case are likely to be involved and obscured, rather than elucidated. Conclusions utterly unwarranted also appear to be drawn from the opinion already rendered, as for example, it seems to be claimed that the decision denies the right to use the water of running streams for irrigation. No such question was raised, considered, or even mentioned in the case, nor in anywise touched in the opinion; furthermore, there is no principle announced or case referred to in it, which in any way warrants such deduction.

Although satisfied that our former opinion is correct, beyond all question, still the principles involved being of such general interest and application, it is important that they should not be misunderstood. We have, therefore, given the matter further consideration; but in the very thorough research which has been made, we have found no legal principle or decided case which would authorize a reversal of our former conclusion, but rather at every step we have met with confirmation of its correctness, and an insuperable barrier to the adoption of any other rule. Before proceeding to an investigation of the legal questions really involved in the case, we may state, once for all, that the fact that the case is " of great interest to the public, whose rights " it is claimed " are seriously disturbed by the decision," is a consideration which, in very doubtful cases, may, nay perhaps should, have some weight with judicial tribunals. But that the interests of the public should receive a more favorable consideration than those of any individual, or that the legal rights of the humblest person in the state should be sacrificed to the weal of the

many, is a doctrine which it is to be hoped will never receive sanction from the tribunals of this country.    The public is in nothing more interested than in scrupulously protecting each individual citizen in every right guarantied to him by the law, and in sacrificing none, not even the most trivial, to further its own interests.    Every individual has the right, equally with the public at large, to claim a fair, impartial consideration of his case ; for the rights of the public are no more sacred or entitled to greater protection in law than those of the individual — therefore, in actions between individuals, the consideration of public interest has weight only when there is grave doubt as to where the right lies.    This doctrine, which would justify the courts in depriving a person of a civil right to-day for the public good, might to-morrow force them to sacrifice his life to the clamors of a mob ; which would deprive Haines of his property at one time, might operate against Vansickle at another.    As in this case we have no doubt whatever as to what should be our conclusion, the fact that it may injuriously affect the public can have no weight in its consideration.    Happily, however, we do not think the decision, if properly understood, will produce the general disastrous results apprehended by counsel for respondent.

As the appellant here claims the water of Daggett creek as an incident to the land patented to him by the United States, and as it is admitted that he could get only such title and right as was vested in the United States itself, it becomes necessary to ascertain what is the nature of the rights of the federal government to the public land; and we propose to show—1st, that it has the absolute and perfect title ; 2d, that running water is primarily an incident to, or part of the soil over which it naturally flows ; 3d, that the right of the riparian proprietor does not depend upon the appropriation of the water by him to any special purpose, but that it is a right incident to his ownership in the land to have the water flow in its natural course and condition, subject only to those changes which may be occasioned by such use by the proprietors above him, as the law permits them to make of it ; 4th, that the government patent conveyed to Haines not only the land, but the stream naturally flowing through it; 5th, that the common law is the law of this state, and

must prevail in all cases where the right to water is based upon the absolute ownership of the soil.

It is a proposition universally admitted, that the United States is the unqualified proprietor of all public land to which the Indian title has been extinguished. Certainly there is none other who has any right to, or claim upon it, which in any way qualifies the right of the federal government. Although it has sometimes been suggested that the unoccupied lands belonged to the several states in which they may be located, the suggestion has never received the serious sanction of statesmen, or the courts of the country. On the contrary, it is the invariable language of the judges, that the unqualified right of property is in the United States. " The English doctrine in relation to real estate is, that there can be no adverse possession against the crown, nor against its grantee, until there be a new entry after the grant. An entry on lands belonging to the crown is held not to be a disseizin, but a mere intrusion on the king's possession. His possession is not thereby divested, but, in legal contemplation, still continues. The king not being disseized by the entry, his conveyance of the freehold is good, and his grantee is seized by virtue of it. The grantee succeeds to the rights of the crown, and cannot be disseized without another entry after the conveyance. The individual making the original entry acquires no new right by the conveyance, but only continues his old interest and remains an intruder still, liable to be sued in trespass. This is the doctrine distinctly stated in Bacon's Abridgment, 331 ; Title, ' Disseizin.' There can be no doubt but that the same principles are applicable to the government of the United States. It possesses the same right of sovereignty and prerogative in respect to the public lands. By the right of *eminent domain*, it is the absolute and exclusive owner of all the public lands which it has not alienated or appropriated. It is seized of them to as full an extent as the British government can be of its domain. It cannot be disseized : no adverse possession is created by an entry on its lands. The entry is tortious, and confers no right on the person making it. Possession thus acquired can never ripen into a right, nor authorize any defense against the government. The government may treat the person thus in possession as an intruder, and sue him in trespass.

On the sale of the lands by the United States, the patent transfers to the purchaser the entire legal estate and seizin to as full an extent as the government held them." 2 Gilman, 652.

"It cannot be denied," say the Supreme Court, in *Irvine* v. *Marshall*, 20 How. 561, "that all the lands in the territories, not appropriated by competent authority before they were acquired, are in the first instance the exclusive property of the United States, to be disposed of to such persons, at such times, in such modes and by such titles as the government may deem most advantageous to the public fisc, or in other respects may deem most politic." Respecting the right of the state to interfere with its title, or the mode of conveyance by it, the court further say : " But the property in question was a part of the public domain of the United States ; Congress is invested by the constitution with the power of disposing of, and making needful rules and regulations respecting it. Congress has declared, as we have said, by its legislation, that in such a case as this a patent is necessary to complete the title. But in this case no patent has issued ; and therefore, by the laws of the United States, the legal title has not passed, but remains in the United States. Now, if it were competent for a state legislature to say that, notwithstanding this, the title shall be deemed to have passed, the effect would be, not that Congress had the power of disposing of the public lands and prescribing the rules and regulations concerning that disposition, but that Illinois possessed it. That would be to make the laws of Illinois paramount to those of Congress in relation to a subject confided by the constitution to Congress only ; and the practical result in this very case would be, by force of state legislation to take from the United States their own lands, against their own will and against their own laws. We hold the true principle to be this, that whenever the question in any court, state or federal, is, whether a title to land which was once the property of the United States has passed, that question must be resolved by the laws of the United States."

So Congress may prohibit and punish trespassers on the public lands. Having the power of disposal and of protection, Congress alone can deal with the title. And no state law, whether of limitation or otherwise, can defeat it. *Jourdan* v. *Barrett*, 4 How.

185. See also *Bagnell* v. *Brodnill*, 13 Peters, 450. " In this country," says Catron, J., in *United States* v. *Hughes*, 11 How. 568, " the lands of the United States lying within the states are held and subject to be sold (under the authority of Congress) as lands may be held and sold by individual owners or by ordinary corporations ; and similar remedies may be employed by the United States as owners, that are applicable in cases of others. This we think is manifest." It not only has the sole right to sell, but it may like an individual lease any portion of the public domain. *United States* v. *Gratiot*, 14 Peters, 526. So the government is entitled to all the legal and equitable remedies with which any ordinary proprietor is vested for the protection of such property. It has been very frequently held that it might maintain trespass against persons intruding upon its land, should it choose to do so. *United States* v. *Gear*, 3 How. 20. " It would present a strange anomaly indeed," says Grier, J., ( *Colton* v. *United States*, 11 How. 231) " if having the power to make contracts and hold property as other persons, natural or artificial, they were not entitled to the same remedies for their protection. The restraint of the constitution upon their sovereign powers cannot affect their civil rights. Although as a sovereign the United States may not be sued, yet as a corporation, a body politic, they may bring suits to enforce their contracts and protect their property in the state courts, or in their own tribunals administering the same laws. As an owner of property in almost every state of the union, they have the same right to have it protected by the local laws that other persons have. As was said by this court in *Dugan* v. *United States,* 'it would be strange to deny them a right which is secured to every citizen of the United States.' " Not only has it all the common law remedies for the protection of its property, but it may proceed summarily by military force to remove those who may be deemed intruders upon its property, (1 Opinions Attorneys General, 471) or the president may direct the marshal to remove such from lands belonging to it. 1 Woodbury & M. 82. These authorities illustrate the character of right or title which the United States has to the public land, and show very clearly that it is as absolute, perfect and complete as can be held or acquired by an individual. Indeed, it must necessarily

be so, for in this country all titles to land emanate from it, and no person can acquire a greater title than his grantor possessed.    It is not to be inferred from what is said, that a person going upon such public land as is open to preëmption with the intention of acquiring title to it, can be deemed an intruder or trespasser, for in such case the acts of Congress authorize the entry.    But that in nowise tends to show that the title of the government to the public land is not so absolute that it could prohibit all entry upon it, should it choose to do so.    It might repeal all its preëmption laws and arbitrarily refuse to part with an acre of its soil ; prohibit any entry upon it, and maintain actions of trespass or ejectment against all intruders. Can it be.said then, with any show of reason, that it has not as complete a dominion over its property as individuals or corporations? Being the absolute owner of the soil, the source of all title thereto, and entitled to all the remedies for its protection and preservation which are given to any individual owner, it certainly cannot be maintained that it is not equally entitled to everything which is naturally such an inseparable incident to the land, that it is frequently spoken of as a part of the soil itself.    Such an incident is a natural water-course.    It passes by deed of the soil without any mention, and forms as marked a feature of the land through which it passes as the trees upon it, or the vegetation which it nourishes. Nothing more readily recommends itself to the understanding than that an element which the laws of nature have connected with the freehold, and which, without any effort on the part of man, clothes it with refreshing verdure ; where without it there must be only forbidding nakedness ; creating fertility and productiveness where otherwise there would be only sterility ; at once administering pleasure and affording profit, is necessarily a part of, or an incident to his land.    This is the natural effect of running water, independent of any use which may be made of it in administering to the immediate wants of man and beast.

How frequent it is that small streams of water are found to add immeasurably to the value of estates, even when no particular use is made, or intended to be made of them !    It is very seldom, indeed, that they do not, to some extent, enhance the value of real property, and they are frequently esteemed invaluable.    Another

consideration which gives value to land through which certain streams
are accustomed to flow, and which at common law is considered a
valuable right, is the privilege of exclusive fishery, which, however,
might be entirely destroyed if the stream were diverted, and the
value of the land in some measure at least depreciated.   " It was
a settled principle of common law, that the owners of lands on the
banks of fresh water rivers, above the ebbing and flowing of the
tide, had the exclusive right of fishing as well as the right of prop-
erty opposite to their respective lands, *ad filum medium aquœ.*
And when the lands on each side of the river belonged to the same
person, he had the same exclusive right of fishing in the whole river
so far as his land extended along the same." 3 Kent, 411.   For
an interference with this right in any way, either by obstructing
the passage of fish or otherwise, the law gives a right of action.
How can it be said, then, that a water-course is not essentially a
part of the freehold itself?   That it is so, the authorities bear
abundant witness.   We do not wish to be understood as saying
that there is such an absolute property in the water that the whole
stream may be destroyed by a riparian proprietor, so that others
below him will be deprived of it; but that it is an incident of his
land to the extent that he has the right to have it continue to flow
in its natural course, subject to such changes only as may be occa-
sioned by such use of it as the law allows the various proprietors to
make, as it passes along, and which will be hereafter more fully ex-
plained.   In this sense only is the right to be understood, when
spoken of in the authorities about to be quoted.

"Land," says Lord Coke, (4 co.) " in legal signification com-
prehendeth any ground, soil or earth whatsoever, as meadows, pas-
tures, woods, moors, waters, marshes, furses and heath.   *Terra est
nomen generalissimum et comprehendit omnes species terrœ.*"   "The
right of private property in a water-course," says Angell, (page 3)
" is derived as a corporeal right or hereditament from, or is em-
braced by, the ownership of the soil over which it naturally passes.
The well known maxim, *cujus est solum ejus est usque ad cœlum,*
indicates that land in its legal signification has an indefinite extent
upwards, and therefore it is that a grant conveys to the grantee
not only ' the field or the meadow, but all growing timber and water

18

standing and being thereupon, and a stream of water is therefore as much the property of the owner of the soil over which it passes as the stones scattered over it.'" Again, (page 9) "The only mode by which a right of property in a water-course above tide water can be withheld from a person who receives a grant of the land, is by a reservation directly expressed or clearly implied to such effect. If the intention of the grantor is not to convey any interest in the water, or any portion of it, he can exclude it by the insertion in the instrument of conveyance of proper words for the purpose of doing so; but, in the absence of such words, the bed, and consequently the stream itself, passes by the conveyance." If it be not an incident to the land, clearly it would not necessarily pass by such grant. "The uses of the waters of private streams," say the Supreme Court of Ohio, (10 Ohio, 297) "belong to the owners of the lands over which they flow. They are as much individual property as the stones scattered over the soil." Says Chancellor Kent, in *Gardner* v. *Village of Newburgh*, (2 John Ch. 166) "A right to a stream of water is as sacred as a right to the soil over which it flows. It is a part of the freehold of which no man can be disseized but by the lawful judgment of his peers, or by due process of law."

It is said in the note to *Ex parte Jennings*, 6 Cowen, 543 : "The general distinction deemed of so much excellence and importance by these learned judges, and which at this day no lawyer will hazard his reputation by controverting, is that rivers not navigable, that is fresh water rivers of what kind soever, do of common right belong to the owners of the soil adjacent, to the extent of their land in length ; but that rivers where the tide ebbs and flows belong of common right to the state ; that this ownership of the citizens is of the whole river, viz : the soil and the water of the river, except that in his river where boats, rafts, &c., may be floated to market the public have a right of way or easement." In *Wadsworth* v. *Tillotson*, 15 Conn. 372, speaking of the rights to a water-course, the Supreme Court say : "This right is not an easement or appurtenance, but is inseparably annexed to the soil, and is parcel of the land itself." Says Chief Justice Shaw, in *Elliott* v. *Fitchburg Railroad Company*, 10 Cushing, 193 : "The right to flowing water is

now well settled to be a right incident to property in the land."

And again in *Johnson* v. *Jordan*, 2 Met. 239 : " It is inseparably annexed to the soil, and passes with it, not as an easement nor as an appurtenance, but as parcel.    Use does not create it ; and disuse cannot destroy or suspend it."    " Water," says Judge Murray, (8 Cal. 140) " is regarded as an incident to the soil, the use of which passes with the ownership thereof."    Say the Supreme Court of North Carolina: " The right is not founded in user but is inherent in the ownership of the soil, and when a title by use is set up against another proprietor there must be an enjoyment for such a length of time as will be evidence of a grant."    *Page* v. *Williams*, 2 Devereux & B. 55.    But again : "The common right here spoken of is not that existing in all men in respect of things *publici juris*, but that common to the proprietor of the land on the stream.    And as between them, the use to which one is entitled is not that which he happens to get before another, but it is that which by reason of his ownership of land on the stream he can enjoy on his land and as appurtenant to it."    The Supreme Court of Vermont say, in *Davis* v. *Fuller*, 12 Vermont, 190 : " The owner of the land has rights to the use of a private stream running over his land peculiar to himself as owner of the land, not derived from occupancy or appropriation, and not common to the whole community.    It is the right to the natural flow of the stream.    Of this right he cannot be deprived by the mere use or appropriation by another, but only by grant, or by the use or occupancy of another for such length of time as that therefrom a grant may be presumed."    " As to all fresh water rivers, above the tide, the common law rule of property is the reverse ; it is presumed to be private, and in the absence of proof of any other right is always held to be in the owners of the banks, who are considered the grantees of the soil of the river's bed, and of the use of the waters to the middle of the stream.    Such property in small and wholly unnavigable rivers is strictly private and exclusive.    It is as perfect as the right to the adjacent dry land, not only as Hale says ' in property but in use.' ".    Senator Verplanck, 26 Wend. 413.

Being an incident to the soil; treated in all respects like other incidents to the land ; being, as some courts say, as much a part of

the soil as the stones or the trees upon it, upon what principle can it be contended that the United States, which is the source of all title, which has as complete and absolute an ownership to the soil as can possibly be acquired, does not, like other owners of land, possess this most inseparable incident to it ; that which is a part of it, and without which, in many cases, the land itself would be of no value ? If it has not the same right to running water that other proprietors of land have, then any individual may divert streams from land belonging to it, without regard to whether it may de- sire to make use of them at some future time ; and so, in many cases perhaps, render thousands of acres of land utterly worthless, which otherwise would be valuable and find a ready market. So, too, as no person can get a better or more complete title than that which the United States itself has, no one claiming by patent under it can possess the right, which is so universally conceded to all persons owning land upon or over which streams of water flow, but must be confined to such rights as may be acquired by actual appropriation or use ; which would be a condition of things existing in no country in the world where the full title is in the individual. If, as we have shown, the water naturally flowing through land is an incident or part of the land itself, whence the authority in a state court to hold that such incident does not attach to the land belonging to the United States ? It might as well be argued, and indeed it can be maintained with as much plausibility, that it has not the right to the growing timber upon it, which is not more a feature of the soil itself than a natural water-course running through it. Having shown that it is an incident of the land through which it passes, or rather a part of it, what becomes of the argument " that running water is not the subject of property except in its use ; and use in the very nature of things requires a person capable of enjoyment; but as the United States has not the capacity to use, it can have no inter- est or property in it." If a stream be an incident to the land, it can no more be diverted, simply because it cannot be presently used by the person owning the land, than he can be deprived of any other property for the same reason. The whole argument on this point evidently originates out of an utter misunderstanding of what s meant by the court, when it is said that the riparian proprietor

" has no property in the water itself, but simply a usufruct while it passes along." The very reason given for this statement shows that the riparian proprietor has a right beyond that which is claimed by counsel; it is this: that as each proprietor has a right to the flow of the stream through his land as it was wont to, as it is the common property of all the owners of the soil through which it passes, no one of them can have such a property in the water as will entitle him to consume or divert it all from those on the stream below him, as he might do if he had an absolute property in the water itself; hence the expression so often used. It is, however, never employed as limiting the entire right of the riparian proprietor to the mere use of water; he has another right, and one which is universally admitted; that is, the right to have the stream continue to flow through his land, irrespective of whether he may need it for any special purpose or not. He has the right to the natural benefit which a stream affords, independent of any particular use, for the fertility which its natural flow imparts to the soil. In other words, his right has a double aspect; first, the right of having the course of the stream continued through his land, which is absolute and complete, as against all the world; and, secondly, the right to make such use of the water, as it passes through his land, as will not damage those who are located on the same stream, and are entitled to equal rights with himself.

If this be not the character of his right, what is to be understood by the maxim so often quoted, and which lies at the foundation of water rights, *aqua currit et debet currere ut currere solebat?* This is substantially that no man has the right to divert a stream from its natural course; for to say that water should be permitted to run as it used to is a prohibition upon all to divert it from its course, and thus the very maxim shows the proprietors have the right to claim that the stream shall be permitted to run through their land in its natural channel, independent of whether they make any particular use of it or not. Suppose there be a waterfall or power upon a tract of land, and it may be supposed the land is valuable only for a mill-site, but is not presently used; will it be said that its whole value may be destroyed by the diversion of the water, or that a valuable mineral spring which is not used may be

abstracted from it, and that the owner has no remedy simply because he had not appropriated it to some useful purpose when the diversion or abstraction took place? 'Indeed, the authorities are without exception, that the right to have the water flow in its accustomed channel does not depend upon the fact that any special use is or may be made of it by the proprietors; and no case, no *dictum* and no intimation of opinion to the contrary, when rightly understood, can be found in the books, except perhaps in the California cases, which we will show have no application whatever to this. It is said by Phear, in his work on Water-Courses, page 31, "that every riparian proprietor has a right whether he uses the stream or not, to have its natural conditions within his own limits preserved from sensible disturbances arising from acts on the part of other riparian proprietors, whether above or below, or on the opposite banks." "The proposition," say the court of king's bench in *Mason* v. *Hill*, 5 Barn. & Ad. 11, "that the first occupant of running water for a beneficial purpose has a good title to it, is perfectly true in this sense: that neither the owner of the land below can pen back the water, nor the owner of the land above divert it to his prejudice. In this, as in other cases of injury to real property, possession is a good title against a wrong doer, and the owner of the land who applies the stream that runs through it to the use of a mill newly erected or other purposes, if the stream is diverted or obstructed, may recover for the consequential injury to the mill. *But it is a very different question whether he can take away from the owner of the land below one of its natural advantages*, which is capable of being applied to profitable purposes, and generally increases the fertility of the soil even where unapplied, and deprive him of it altogether by anticipating him in its application to a useful purpose. If this be so, a considerable part of the value of an estate, which in manufacturing districts particularly is much enhanced by the existence of an unappropriated stream of water with a fall within its limits, might at any time be taken away; and by parity of reasoning a valuable mineral spring might be abstracted from the proprietor in whose land it arises, and converted to the profit of another. We think this proposition has originated in a mistaken view of the principles laid down in the decided cases of *Bealy* v.

*Shaw, Saunders* v. *Newman* and *Williams* v. *Morland.*" Creswell, J., in *Sampson* v. *Haeldmott,* 1 Common Bench, says : " As to the latter proposition, it appears to us that all persons having lands on the margin of a flowing stream have by nature certain rights to use the water of that stream, whether they exercise those rights or not." ' Said Lord Ellenborough in *Bealy* v. *Shaw,* 6 East. 208: " The general rule of law, as applied to this subject is, that independent of any particular enjoyment used to be had by another, every man has a right to have the advantage of a flow of water in his own land."

The Supreme Court of Massachusetts, in *Elliott* v. *Fitchburg Railroad Company,* say: " If the use which one makes of his right in the stream is not a reasonable use, or if it causes a substantial and actual damage to the proprietor below by diminishing the value of his land, though at the same time he has no mill or other work to sustain present damage, still, if the party thus using it has not acquired a right by grant, or by actual appropriation and enjoyment twenty years, it is an encroachment on the right of the lower proprietor for which an action will lie." " Every riparian proprietor," says Angell, § 134, " necessarily and at all times is using the water running through it, in so far at least as the water imparts fertility to the land and enhances the value of it. There is, therefore, no prior or posterior in the use of the land, if each enjoyed it alike from the origin of the stream   *   *   *. The right is not founded in user, but is inherent in the ownership of the soil." The learned Chief Justice Ruffin, of North Carolina, in *Pugh* v. *Wheeler,* 2 Dev. & Battell, 50, says upon this point : " The argument of the counsel, however, assumes that the right to water can be acquired only by use, and therein we think consists its error. The *dicta* on which he relies had reference to the cases of prescriptive title, or where the party had only the rights of a possessor. But it is not true that the right to water is acquired only by its use, and that it cannot exist independent of any particular use of it. That doctrine is correctly applied to the air and to the sea, or such bodies of water as from their immensity cannot be appropriated by individuals, or ought to be kept as common highways for the constant use of the country and the enjoyment of all men. In such

cases particular persons cannot acquire a right, that is, a several and exclusive right by use or any other means ; but with smaller streams it is otherwise.    They may still be *publici juris* so far as to allow all persons to drink the water and the like, and also so far as to prevent a person to whose land it comes from thus consuming it entirely by applying it to other purposes than those for which it is conceded to every one *ad lavandum et potandum*, as to divert or corrupt it."    And the Supreme Court of New York, 10 Wend. *Crocker* v. *Bragg :* " A person through whose farm a stream naturally flows, is entitled to have it pass through his land although he may not require the whole or any part of it for the use of machinery. Upon any other principle this right to the stream, which is as perfect and indefeasible as the right to the soil, would always depend upon the use, and a party who did not occupy the whole for special purposes would be exposed to have the same diverted by his neighbor above him without remedy, and which diversion by twenty years' enjoyment would ripen into a prescriptive right beyond his control, and thereby defeat any subsequent use."    See also *Corning* v. *Troy Iron & Nail Factory*, 40 N. Y. 191.    Such is the invariable rule, iterated and reiterated through all the books, and of which there seems to be no denial.    These cases show that the owner of the soil can insist upon having the stream continue to run through his land as it was wont, independent of any special use of it.    The fact as stated by Chief Justice Ruffin, that he is necessarily and at all times using the water running through his land, in so far at least as the water imparts fertility to the soil and enhances its value, is a sufficient user to entitle him to claim that he shall not be deprived of it.

These authorities completely overturn the argument for the petitioner in this case : for if the right be one inseparably incident to the land ; if the right to have the stream continue its flow in its natural channel does not grow out of or depend upon any special user ; or if, in the language of the cases, the owner of land on a stream is necessarily and at all times using the water running through it without any act of his own, by the fertility which its natural flow imparts to the soil, then it follows that the United States is as capable of enjoying the right as an individual, as its

Vansickle *v.* Haines.

land will be no less benefited by the natural flow of the stream than that of the citizen, nor would the diversion of it be any less injurious to it than it would to an individual who is making no special appropriation of it.    Indeed, the whole argument is based upon the assumption that the riparian proprietor has no right to have a stream continue its flow through his land unless he has some special use to make of it, or has made some particular appropriation of it; whereas every case which has ever come under the observation of the courts, (and they are numerous) holds the contrary.

But we may admit, for the purposes of this case, in the language of the propositions laid down in the petition as the foundation of the argument, that " there is no property in running water, except that which is acquired by use, and that in such case there must be a person capable of using it, and a necessity for its use."    It is assumed, as if it were a matter of course, that the United States is incapable of making use of the water of small running streams; and from that the conclusion is at once reached that it can have no right to it.    The premise, it will be observed, is, not that the United States *has* not, but that it is *incapable* of making, use of a stream. Let us see how facts bear out this assumption.    It is well known that the government of the United States has been the owner of and has run some of the most extensive manufacturing establishments in the country, and this, too, from its earliest foundation. As early as April, 1794, Congress passed an act providing for the erection and maintenance of arsenals.    In accordance with this act the government secured title to certain land on Mill River, in Springfield, Massachusetts, and erected buildings suitable for manufacturing small arms, which have been occupied for that purpose ever since.    Over fifteen hundred men are employed, and the production is often twelve thousand guns per month.    The machinery of these extensive works is principally driven by the water power of Mill River.

Again, the federal government alone has the right to coin money. For the purposes of propelling the machinery of its mints, it might desire the use of any stream for water power or otherwise.    That it has the right to erect arsenals or mints on any of the streams running through its land, is a proposition never before questioned; and

if it can do so, it can make use of the water, as can any private individual. Furthermore, the same constitutional power which authorizes the government to erect and maintain arsenals, as fully authorizes it to erect such other establishments for manufacturing clothing and equipments for its armies as it may deem proper. Indeed, such establishments of an infinite variety may be erected and operated by it, in connection with which the streams of water passing through its land might be of incalculable value. Nor has it ever been questioned that it had the right to be protected in the enjoyment of such right, should it choose to exercise it. *United States* v. *David Ames,* 1 Woodbury & Minot's R. 76, which was an action for an interference with its water power at Springfield. How, then, in the face of these well known facts, and of the admitted power of Congress to make like use of any stream in any part of its domain, can it be claimed it is *incapable* of making use of it; or, in the language of the petition, that " it cannot engage in crushing quartz, or other like business, and can therefore acquire no use in water for the propulsion of machinery." It must be borne in mind that the assumption is, and such is the argument, that the United States is *incapable* of making use of a stream of water—not that it is not making use of the stream in question. The fallacy of this argument is, we hope, sufficiently shown, and it is unnecessary for us to go further than to establish the untenableness of the precise position taken. The United States being *capable* of making use of a watercourse at least for the purposes of manufacturing, possibly at some future time may have the necessity for such use ; so there is no more reason why it cannot hold it for such possible future necessities than an individual. And we have shown it is uniformly held that the right of the individual is in no wise affected by the fact that he has no present use for the stream.

It is asked in argument, as a forcible illustration of the doctrine that the United States has no property in the water of a running stream, " how is it that a riparian owner upon navigable waters who has title from the government, may not use the water as it flows through his land in whatever manner he sees fit, even to the obstruction of navigation, the patent never making any reservation of an easement in favor of the public " ? The answer is obvious,

and the reason certainly should be known to counsel. It has been the uniform practice of Congress to declare the various rivers of its territories navigable, and that they " shall be common highways and free for all." Brightly's Digest, 105 ; 1 Statutes at Large, 491 ; 2 Id. 235, 279, 642, 666, 703 ; 3 Id. 349. Upon these statutes it has been always held that the riparian proprietors had not the right to interfere with the navigation of such rivers, because as decided by the Supreme Court of the United States in *Railroad Company* v. *Schurmeir*, 7 Wallace, 272, such laws must have the same effect as if they were incorporated into the patent issued to the proprietors on the streams.

But, it is argued if the United States ever had any right to the stream in question, it parted with it, and authorized the respondent here to make the diversion complained of, prior to the time it conveyed the land over which its natural course lay to the appellant, and consequently that the patent to Haines did not convey the right to the water. This result is arrived at in this way : the territory of Utah, of which this state formed a part, was authorized by Congress to enact appropriate legislation for the territory ; but all the laws passed by the legislative assembly and governor were required to be submitted to it, and if disapproved they should be null and of no effect. It is said that the effect of this delegation of power was to make all the enactments of the legislature of Utah as authoritative and binding as if they originated with, and were passed by Congress itself ; and therefore, that the United States authorized and sanctioned the diversion made by Vansickle, and that the government is bound thereby.

But if the United States is to be held bound by the acts of the territorial legislature of Utah as to its property, it would seem to be necessary to show that the acts in question were submitted to Congress and not disapproved by it, as such condition was imposed in the act organizing the territory. As between individuals, such showing might not be necessary ; but here is a right claimed against the United States itself, by virtue of a legislative act of a territory. As the government creating that territory required all acts passed by its legislature to be submitted to Congress, it seems but reason-

able to require a person claiming such right to show that the acts under which he claims were so submitted before they could be considered its acts, or acts enacted by its authority; but no such showing is made here. And it is quite probable the acts in question were never brought to the attention of Congress.

But independent of this, there are two other conclusive answers to this position : first, the acts in no wise authorize the diversion of water as was done in this case; and second, if they did so, they were in direct conflict with that provision of the organic law of the territory which inhibited it from interfering with the primary disposal of the soil, and were for that reason utterly void. If the acts referred to authorize a diversion of water from public lands, they are in the nature of grants by the government, which must always be construed most favorably to the government, and they pass nothing by implication. *Wilcoxon* v. *McGhee*, 12 Ill. 381, and cases there cited. It is incumbent then upon the person claiming such grant, to show clearly that the government intended to confer the right claimed, and that it comes strictly within the grant itself.

The first section referred to as authorizing the diversion of the waters of Daggett Creek by the respondent, reads thus : " The county court has the control of all timber, water privileges, or any water-course or creeks, to grant mill-sites, and exercise such powers as in their judgment shall best preserve the timber and subserve the interests of the settlements in the distribution of water for irrigation or other purposes. All grants held under legislative authority shall not be interfered with." Section 38, page 127, of the compiled laws of Utah. It will be readily perceived that this simply confers upon the county court the control of water-courses and the timber on the public land. It doubtless authorized that tribunal to grant the right to divert water, but nowhere intimates that any individual may make such diversion without the sanction of the court. Under this section, a person could only acquire such right from the county court, to which alone the right of controlling such matters is given by the section quoted. But it is not claimed for Vansickle that the court ever authorized him to make the diversion which he claims he has the right to make by virtue of this section; or that he had any prior legislative grant. The next section to which our

attention is called, is Section 7, page 155, of the same volume, which reads: "That if any person or persons, after there shall have been a diversion of water lawfully made in any county or precinct in this territory for irrigation or other purposes, shall in any way infringe upon the rights of any person or persons, they shall be liable in an action of trespass to the parties damaged, and liable to be fined at the discretion of the court having jurisdiction." There can certainly be no two candid opinions as to the effect of this section, or the object sought to be accomplished by it. It grants no right of any kind to any one, but simply provides a punishment for the violation of rights supposed already to exist. Those who, by grants from the county court or legislature, were supposed to have obtained the right to divert water from the natural water-courses, could undoubtedly under this section maintain an action against any person interfering with such right. But before any such action could be maintained, it would be necessary first to show the *right to divert;* for this section does not pretend to grant such right. Can it, then, be claimed that this act amounts to a sanction by Congress of the diversion made by the respondent? Clearly not. Section 6, page 175, is with reference to surveying lands, and there is nothing in it respecting a diversion of water in any way. Section 1, pages 206–7, simply provides "that when water is taken from a stream by means of a ditch or sect which must cross any road, the person or persons so conducting the water shall be required to make, or cause to be made, a good and sufficient culvert, gravel ford, or bridge over such ditch or sect, and keep the same in repair where the same crosses any such public road or highway." What is there in this section authorizing a person who has no land on a stream, or no legal right to divert water from a stream, to make such diversion? Manifestly, it gives no sanction to any diversion by a person not already having the right to do so. It must be assumed that the persons, who are here required to bridge their ditches where they crossed any highways, had first the right to divert the water. Surely it grants to no one the right to divert a stream from its natural channel, but only regulates the manner of diversion by those who may already have the right to do it. And these are the acts of Utah, which it is said are as obligatory upon the United

States as if they were enacted by Congress itself, and which it is claimed grant to Vansickle the right to divert water from the public land to land occupied by him.

Again : the organic act of Utah declared that the legislature should pass no law interfering with the primary disposal of the soil in the territory.    Now, as we have shown that a natural water-course is an incident of the land, in fact a part of the soil, in the language of some of the cases, it is clear that no act of the legislature of Utah would be valid which in any way attempted to confer any right to the water of the streams on the public land.    An act conferring a right to divert a stream, would be of no more validity than one authorizing the cutting of timber, or indeed, granting a title to a portion of the public land itself.    It would be a bold interference with the primary disposal of the soil.    The diversion of a stream from its natural course might more completely change the character of the land through which its course lay, and decrease it in value, than to strip it of its timber.    Hence the one act can be no less an interference with the primary disposal of the soil than the other, and surely no one will contend that an act of the territory of Utah authorizing him to cut timber on the public land would confer upon him any right as against the United States or its grantee, or that such an act could be sustained for a moment against the provision of the organic act referred to.    It might as well be claimed that, because the territorial legislature of Nevada passed acts regulating the manner of holding and obtaining possession of public land, therefore the United States is bound by such acts, and could not afterwards interfere with the possession acquired under or in accordance with them.    The territorial courts, in conformity with territorial statutes, uniformly held that any person could hold as much land as he chose to enclose or cultivate.    Such was always the rule until the surveys by the United States, and the land was thrown open to preëmption.    But no one has ever had the hardihood to claim that the territorial statutes, customs or decisions gave any right as against the preëmptor, or the United States.    The man who may have enjoyed and cultivated for years his thousand acres was compelled to submit to the act of Congress, which only authorized him to preëmpt one hundred and sixty acres

of it.   If such acts conferred no title as to the land itself, why more so to the water which is an incident to it?   This view goes further than to show that the United States granted to Vansickle no right to the water of Daggett Creek—it negatives the idea that the general government has in any way indicated it to be its policy to permit the diversion of streams from their natural channel on the public land.   Furthermore, it is clearly manifest from its pre-emption laws, that no such policy has ever been sanctioned by it. The only rights which can be acquired to the public agricultural lands are provided for by the preëmption laws, and the manner of obtaining such rights is specifically set out ; and no right to, or interest in that character of land can generally be acquired from it, except by means of, and by pursuing the requirements of those laws.   As it has specifically provided the course to be pursued, and designated the rights which will be recognized, it cannot be said that it has sanctioned any policy or means of acquiring such right, except those designated.   But the right to divert water from a natural water-course, it must be admitted, creates an interest in the land from which the diversion is made in favor of him having the right.   Angell on Water-Courses, Sec. 314.   Further than this, the right to divert carries with it the right to go upon the land through which the ditch or flume is conducted, and upon which the dam, by means of which the diversion may be affected, is built, to keep them in repair.

Suppose, for example, that the dam built by Vansickle for diverting this water from the creek was on land purchased by Haines from the United States, and the ditch through which it was conducted ran through such land.   Now if Vansickle acquired the right to divert the water as against the United States, he has the same right as against Haines; and that right necessarily gives him the privilege, at any and all times, when he may choose, to go upon the land of Haines, to keep his ditch and dam in proper repair — which, in itself, would be an interest in Haines' land.   Angell on Water-Courses, Sec. 141 ; 2 Washburn on Real Property, 68.   And thus, contrary to all pre-emption laws, and the manifest policy of the government as embodied in them, a person may get an interest in public land beyond his one hundred and sixty acres.   All the acts of Congress ever adopted

up to 1866, clearly show that it has never been the policy of the United States to sanction anything of the kind ; but on the contrary to ignore all rights to or interest in its land, except such as might be acquired by means of its own preëmption laws or other similar acts expressly conferring or confirming them—in other words, to keep the public land in such condition as that it can give to its patentee an absolute and perfect title, free from all easements and incumbrances of all kinds.   No purpose of the general government is more perfectly manifest, from all the legislation of Congress and decisions of its courts, than this.   The diversion here complained of cannot, then, be said to be sanctioned by any policy of the United States.   The act of Congress of July, 1866, if it shows anything, shows that no diversion had previously been authorized ; for, if it had, whence the necessity of passing that act, which appears simply to have been adopted to protect those who at that time were diverting water from its natural channel ?   Doubtless, all patents issued, or titles acquired from the United States, since July, 1866, are obtained subject to the rights existing at that time ; but this is a different case—for if the appellant has any right to the water, he acquired it by the patent issued to him two years before that time, and with which, therefore, Congress could not interfere.   But we do not understand it to be claimed that the act does directly affect this case, but that it is only referred to as exhibiting the policy of the general government.   The answer is, that the policy began with that act, was never in any way sanctioned or suggested prior to the time of its passage, and therefore has nothing to do with this case.

Being the owner of the soil, and as such owner having an absolute right to the streams, and not having granted away any rights of water to Vansickle, nor authorized him to make the diversion complained of ; it becomes necessary to ascertain what right the United States had as against him for making the diversion, and what rights he acquired under the preëmption laws, for it is admitted that Haines received all the right which the United States itself had to convey. Unquestionably, the government, like an individual, has an equal right to protect its property from injury.   Whilst it allows a citizen, or one who has declared his intention to become so, to enter upon one hundred and sixty acres of public land for the purpose of

preëmption, it allows nothing more.   Tò the hundred and sixty acres occupied for the purpose of purchase from the government, the occupant, before he gets a patent, has a good right against all the world, except the government itself — he has not only the right to the land, but everything incident to it.   But he has no right, as against the government, when occupying and improving one quarter section, for the purpose of preëmption or purchase, to enter upon another quarter section, to which he makes no claim whatever, and divert from it a valuable stream of water for the benefit of the land which he is claiming.   As against all, except the United States, or a person who may have acquired some prior right, he may have it, for none other may be in position to complain.   There is certainly no law of Congress authorizing the occupant of a quarter section to enter upon other public land and take from it that which may be its chief value.   If each preëmptor is, by the preemption laws, confined to the hundred and sixty acres which he occupies and intends to purchase, he cannot divert a water-course from other land which he does not intend to purchase or claim, for in that case he makes himself technically a trespasser.

Indeed, nothing is clearer than that an occupant of any portion of the public land has no more right as against the United States to enter upon other portions of it and divert from it a water-course, than he would if, instead of belonging to the United States, it were the property of an individual, for its title to the soil is as absolute and complete as the most perfect title which an individual can obtain, and it has all the remedies for protecting its property which the citizen has, and even more.   If Vansickle had no right to enter upon the land of an individual for this purpose, he would have no greater right respecting land which is public.   And as an individual would have a right to claim the return of the stream if diverted, so with the government.   And all the right or title which the United States had in the land of Haines was conveyed to him by patent; and the patent necessarily carried with it the stream running through the land as an incident to it, together with the right to have it returned to its channel if diverted.   Upon the latter proposition, we may be permitted to refer to two or three cases which we recall to mind at present.   *Cook* v. *Foster*, 2 Gilman, 652 ; *Wilcoxon* v.

*McGhee*, 12 Ill. 381; *Colvin* v. *Burnett*, 2 Hill. 620.    The last two cases were actions for flooding the land of the plaintiff by means of a mill-dam, which however was done prior to the purchase from the government.  The cases are clearly analogous; the right of action for diverting a water-course from land or flooding it by reason of a dam are founded upon the same right, and are generally remedied by the same character of action.    In the case of *Wilcoxon* v. *McGhee*, it appears that Wilcoxon erected his dam and mill on the public land before acquiring a patent to it; this he afterwards procured. The plaintiff, McGhee, did not acquire his title until long after-wards, and after Wilcoxon had enjoyed the privilege of flowing the land patented to him for some years.    After obtaining his patent McGhee brought his action, and the court sustained it, saying in its opinion: " Although the general government in its liberality per-mits persons to enter upon, and subsequently to purchase a tract of public land at the minimum price, yet it could never have been its intention in granting this favor to bestow also upon the settler the privilege perpetually to inundate and render valueless other tracts of public land, by damming up a stream running through the one which he might eventually purchase.  The purchaser, under such circumstances, pays nothing for the privilege of overflowing other lands; it is not a right necessarily or naturally appertaining to the land he purchases, and could never be presumed to have entered into the contemplation of the government in making the grant." Every reason here stated applies with equal force to this case; and the case itself is a direct authority against the pretentions of Van-sickle.

    The case of *Colvin* v. *Burnett* was very similar, only that the land was purchased from the state.  The defendant claimed title by patent from the state, issued in 1807.    There was a mill-site on it, and a dam was afterwards built which set the water back so that another lot owned by the state was flowed.  This latter lot was some twenty years afterwards sold to the plaintiff Colvin, who brought his action against Burnett, and the court unhesitatingly sustained it.  " The question is simply," say the court, " whether by selling a farm lying below mine on a creek which happens to furnish a mill-site on the granted premises, I without one word more

grant the right to drown my farm above.   No one would contend
for such a consequence.   The plaintiff's lot, as laid down on the map
and located by other proof, extends to the creek, and he is entitled
to go *usque filum aquæ* discharged of the artificial flow."   Indeed,
such is the uniform holding by all courts in analogous cases, respect-
ing the public land.   It follows, as the United States while owner
of the land had the right to claim a return of the water of Daggett
Creek to its natural channel, the same right was conveyed to Haines
by the patent to him.

It is argued, however, that " Vansickle used the water adversely
to Haines during the period prescribed by the statute of limitations,
and acquired a right to the same by presumption of grant."   Were
it a fact, as assumed here, that Vansickle used the water for the
period of five years adversely to the *title* of Haines, doubtless his
right would be good, and Haines would not be able to maintain this
action.   But no rule of law is more familiar than that the presump-
tion resulting from adverse holding or user is not a grant against
any particular person, but against the title under which he holds.
A five years adverse user of the water by Vansickle prior to the
issuance of the patent to Haines would, under the laws of the state,
deprive Haines of the right to maintain an action for its diversion,
under the right which he may have acquired by prior appropriation
of the water or occupancy of the public land ; but when he obtains
a patent from the government, he acquires a new title against which
there is no prescription—against which Vansickle could hold nothing
adversely until it come to Haines.   The patent sweeps away all
former titles, and confers upon the patentee as complete a title as
the United States had.   Suppose the rule here contended for were
the law, it will be seen at once that the patent would in some cases
fail to transfer the land to the patentee.   As for example, A has
a right to preëmpt a certain quarter section of land ; B enters and
ejects him, and succeeds in holding the land adversely to him for
five years before a patent is issued ; A finally gets the patent, but
under the reasoning in this case, B could defeat the patent by
showing that he had held the land adversely to A for five years,
and thus the United States would not have the power to grant the
title to the person who under its laws might be entitled to it.   The

presumption respecting the adverse user of water and the adverse holding of land stands upon the same footing, and the reasoning which will sustain the one will likewise uphold the other. So it will be seen the adverse holding or user must be against the government itself if it can defeat or in any wise affect the title which is sought to be conveyed by patent. But it is always held, and no court has ever yet doubted the rule, that the title by patent cannot be defeated, or in any wise modified by state laws, or any adverse holding of the kind here relied on. In *Jourdon* v. *Barrett*, 4 Howard, 184, the Supreme Court of the United States say upon this point, " Some stress in the argument was laid on the fact that possession had been held of the land in dispute under Brangier's claim for more than ten years before the suit of Londry and Jourdon were brought, and therefore, the petitioners were barred by prescription and limitation in Louisiana. * * * To this ground of defense, it is a sufficient answer to say that Jourdon first acquired his interest in 1834, and Londry his, in 1836. Up to that time the lands they claim belonged to the United States as part of the public domain, and on which the defendant Barrett, and those under whom he claims, were trespassers; and that no trespass of the kind can give title to the trespassers as against the United States, or bar the right of recovery, *nor had the operation of time any effect as against Londry and Jourdon until they respectively purchased.* * * * Having the power of disposal and of protection, Congress alone can deal with the title, and no state law, whether of limitation or otherwise, can defeat such title." See also, *Irvine* v. *Marshall*, 20 How. 558. It follows, that the time during which Vansickle diverted the water while the title was in the United States is not to be computed, for it could not affect the title acquired by Haines through the patent, and it is not averred in the complaint, nor is there any claim of a continuous adverse holding of five years since the patent was obtained; this point is, therefore, untenable.

It is said the rule which is adopted in this case may be the rule of the common law, but that it is not applicable to our situation and therefore should not be followed. We have shown that a stream is an incident of the land through which it naturally flows; that it is in

fact a part of the soil itself; that the right to have it continue to flow is as sacred a right as that to the soil itself; that being so an incident of the land, it necessarily passes by conveyance of the land; such being the law, we are unable to understand how or by what authority this court can say the patent of the United States does not convey as complete and perfect a title to its patentee in the state of Nevada as it does elsewhere. There is no rule within our knowledge which would justify a court independent of any common law principle in holding that the appellant Haines should not have the benefits of a stream of water which the paramount proprietor of the soil grants to him by its letters patent. It might as well be said that the courts can deprive him of the land itself by holding that it did not pass by the patent, as to rule so respecting that which is universally admitted and held to be an inseparable and valuable incident to it. There is no rule of law that would not be more applicable to our condition than that which would simply justify judicial robbery.

But perhaps it is the unwarranted conclusion drawn from our former opinion in this case, namely: that the water of a stream could not be used by the riparian proprietors for irrigation, which is thought to be inapplicable to the condition of things in this state.

To this it may be answered: first, that no such decision has been made, nor has anything of the kind been intimated; second, whatever the common law rule may be, whether applicable or not, it is made the law of this state, and is as binding upon us as any statute ever adopted by the legislature; and therefore we have no more power to annul or repudiate it, than we have to disregard a legislative act. The first legislature of the territory of Nevada, (Stats. 1861, page 1) declared that, "the common law of England, so far as it is not repugnant to, or inconsistent with, the constitution or laws of the United States, or the laws of the territory of Nevada, shall be the rule of decision in all courts of this territory." Our state constitution adopted this, like all other laws of the territory, by Section 2 of the schedule, which declares that all laws of the territory of Nevada in force at the time of the admission of the state, not repugnant to the constitution, should remain in force until repealed by the legislature; hence, although the com-

mon law might, in the opinion of judges, be inapplicable, still, if not in conflict with the constitution or laws of the United States, or the constitution or laws of Nevada, it must nevertheless be enforced.

But suppose this decision should necessitate the adoption of the common law respecting the manner in which running water may be used by those having the right to it; although it may operate unjustly in some cases, still, as a general rule, none more just and reasonable can be adopted for this state. It is a rule which gives the greatest right to the greatest number, authorizing each to make a reasonable use of it, providing he does no injury to the others equally entitled to it with himself; whilst the rule of prior appropriation here advocated would authorize the first person who might choose to make use of or divert a stream, to use or even waste the whole to the utter ruin of others who might wish it. The common law does not, as seems to be claimed, deprive all of the right to use, but, on the contrary, allows all riparian proprietors to use it in any manner not incompatible with the rights of others. When it is said that a proprietor has the right to have a stream continue through his land, it is not intended to be said that he has the right to *all* the water, for that would render the stream which belongs to all the proprietors of no use to any. What is meant is, that no one can absolutely divert the whole stream, but must use it in such manner as not to injure those below him. As the right is equal in each owner of the land, because naturally each owner can equally enjoy it, so one must exercise that right in himself without disturbing any other above or below in his natural advantages. " The right of flowing water," says Chief Justice Shaw in *Elliott* v. *Fitchburg Railroad Company*, 10 Cush. 193, " is now well settled to be a right incident to property in the land ; it is a right *publici juris*, of such character that whilst it is common and equal to all through whose land it runs, and no one can obstruct or divert it, yet, as one of the beneficial gifts of Providence, each proprietor has a right to a just and reasonable use of it as it passes through his land; and so long as it is not wholly obstructed or diverted, or no larger appropriation of the water running through it is made than a just and reasonable use, it cannot be said to be wrongful or injurious to a proprietor lower down. What is such just and reasonable use may often be a

difficult question, depending on various circumstances.  *  *  It has sometimes been made a question whether a riparian proprietor can divert water from a running stream for purposes of irrigation. But this, we think, is an abstract question which cannot be answered either in the affirmative or negative as a rule applicable to all cases. That a portion of the water of a stream may be used for the purposes of irrigating land, we think, is well established as one of the rights of the proprietors of the soil along or through which it passes. Yet a proprietor cannot, under color of that right, or for the actual purpose of irrigating his own land, wholly obstruct or divert the water-course, or take such an unreasonable quantity of water, or make such unreasonable use of it, as to deprive other proprietors of the substantial benefits which they might derive from it if not diverted or used unreasonably." This is the doctrine uniformly recognized both in England and the United States, and is the necessary result of the general principles universally recognized respecting running water. The following cases to a greater or less extent bear upon this point : *Mason* v. *Hill*, 3 Barn. & Ad. 305 ; *Id.*, 5 Barn. & Ad. 1 ; *Simpson* v. *Hadinott*, 1 C. B. (N. S.) 611 ; *Emberry* v. *Owen*, 6 Ex. 353 ; Phear on Rights of Water, 14 *passim* ; *Wright* v. *Howard*, 1 Simons & S. 190 ; *Davis* v. *Fuller*, 12 Vt. 178 ; *Snow* v. *Parsons*, 2 Williams, 459 ; *Tillotson* v. *Smith*, 32 N. H. 90 ; *Gerrish* v. *Newmarket Man. Co.* 10 Foster, 470 ; *Blanchard* v. *Baker*, 8 Greenleaf, 253 ; *Ingham* v. *Hutchinson*, 2 Conn. 584 ; *Parker* v. *Hotchkins*, 25 Conn. 321 ; *Wadsworth* v. *Tillotson*, 15 Conn. 366 ; *King* v. *Tiffany*, 9 Conn. 161 ; *Elliott* v. *Fitchburg R. R. Co.*, 10 Cushing, 191 ; *Tyler* v. *Wilkinson*, 4 Mason, 397 ; *Webb* v. *The Portland Man. Co.*, 3 Sum. 189 ; *Campbell* v. *Smith*, 3 Halstead, 140 ; *Pugh* v. *Wheeler*, 2 Dev. & Batt. Law, 50 ; *Canal Appraisers* v. *The People*, 17 Wend. 570 ; *Id.* 5 Wend. 423 ; *Rogers* v. *Jones*, 1 Wend. 237 ; *People* v. *Canal Appraisers*, 13 Wend. 355 ; *Ex parte Jennings*, 6 Cow. 518 ; *Gardner* v. *Trustees of Newburgh*, 2 John Chan. 163 ; *Conning* v. *Troy Iron Works*, 34 Barb. 486 ; *Id.*, 40 N. Y. 204 ; *Crocker* v. *Bragg*, 10 Wend. 260 ; *Arnold* v. *Foot*, 12 Wend. 330 ; *Commissioners of Canal Fund* v. *Kempshall*, 26 Wend. 404 ; *Chas. Davis* v. *Gitchell*, 50 Me. 602 ; *Heath* v.

*Williams,* 5 Me. 602; *Heath* v. *Williams,* 25 Me. 209 ; 1 Cowen & Hill's Notes, 376 ; *Plainliegh* v. *Dawson,* 1 Gill. 544 ; *Board of Trustees* v. *Haven,* 11 Ill. 554 ; *Moffitt* v. *Brewer,* 1 Green, (Iowa) 348 ; 3 Kent, 439.

Not only that, but its evident justness and propriety has recommended its substantial adoption as the law of France, by the code Napoleon, (Art. 640–641–644) which declares : " Celui qui a une source dans son fonds, peut en user á'sa volonté, sauf le droit que la proprietaire du fonds inferieur pourrait avoir acquis par titre ou par prescription.    Celui dont la proprieté bord une eau courante, autre que celle qui est declarée dependance du domaine publique, par l'article, etc., peut s'en servir à son passage pour l'irrigation de ses proprietés.    Celui dont cetti eau traverse l'heritage, peut même en user dans l'intervalle qu'elle y, parcourt mais á la charge de la rendre, a la sortie de ses fonds, a sou cours ordinaire."    And likewise in Louisiana Civil Code, Art. 657.

Whether the right to irrigate land can in this state be considered a natural want, is a point in no wise involved in this case, and which, therefore, does not call for decision.    Counsel must certainly understand that the decisions in California and those formerly made in this state, wherein it was held that priority of appropriation gave a right to water, have no bearing whatever upon this case.    Those decisions were made independent of any title to the soil — in fact, the only right which any person could at that time obtain was by actual appropriation — therefore, it was but simple justice and the dictate of common sense, that he who made the first appropriation should have the better right.    But when one who has the absolute title to the soil claims water by reason of that title, as an incident to his ownership of the land, the question is a very different one. In this case he has the same right which the government of the United States has, as against any person diverting water from its land.    Where there is absolute ownership of the land, as said by the Supreme Court of North Carolina, in *Pugh* v. *Wheeler,* there is then no prior or posterior in the use, for the land of all enjoyed it alike from the origin of the stream, and the title of all persons who claim by patent is as old as the title of the United States itself.

The common law rule is acknowledged to be the law in California

in the very cases relied on as holding differently, and was not applied simply because the title to the land was in the government.    Thus in *Irwin* v. *Phillips*, which is one of the first cases upon the question, the rule of prior appropriation is adopted, because of the absence of any ownership in the soil by either of the parties, as is manifest from the opinions.    It is said: " It is insisted by the appellants that in this case the common law doctrine must be invoked, which prescribes that a water-course must be allowed to flow in its natural channel.    But upon examination of the authorities which support that doctrine, it will be found to rest upon the fact of the individual rights of landed proprietors upon the stream, the principle being, both at the civil and common law, that the owner of lands on the banks of a water-course owns to the middle of the stream, and has the right by virtue of his proprietorship to the use of the water in its pure and natural condition.    In this case, the lands are the property either of the state or of the United States, and it is not necessary to decide to which they belong for the purposes of this case.    It is certain that at the common law the diversion of water-courses could only be complained of by riparian owners, who were deprived of the use, or those claiming directly under them."    Then the court goes on to show that as the parties were not the owners of the soil, the common law rule did not apply.    So again in *Crandall* v. *Wood*, 8 Cal. 141, Judge Murray, after stating the common law rule as to the rights respecting running water, goes on to say, that " Having thus stated the fundamental principle upon which this right is founded, it is evident that the only difficulty in this case arises — first, from the fact that the defendant is not the owner of the fee in the land, but that title to it is in the government of the United States."    The judge then quotes the above language from *Irwin* v. *Phillips*, and the whole case shows that the decision would have been different if the respective parties had been the owners in fee of the lands through which the stream ran.    Without special quotation from the decisions of this state, it is enough to say, that a reference thereto will show that the greatest care was invariably taken to prevent misapprehension on this point. *Lobdell* v. *Simpson*, 2 Nev. 274 ; *Ophir S. M. Co.* v. *Carpenter*, 4 Nev. 534; *Covington* v. *Becker*, 5 Nev. 281 ; *Proctor* v. *Jen-*

*nings,* 6 Nev. 83. That this is the reason upon which the California cases and those formerly rendered in this state is based, and that the common law was not applicable, because of the fact that the person claiming had not the title to the land, is so familiar to the profession that it is incomprehensible how they can be referred to as authority in a case like this, where the absolute title to the land is in the parties, and the appellant is claiming the right to the water, not as was done in the California cases, by virtue of prior appropriation, which was the only right upon which it could then be claimed, but by virtue of his patent; by virtue of having the complete right which the United States itself had. It will be readily perceived, then, that the cases referred to have no pertinency whatever to the question involved in this case.

Being fully satisfied with the former opinion, we must deny a rehearing.

By GARBER, J., concurring:

If I believed that a re-argument could throw any additional light on the questions involved, I should unhesitatingly advise the granting of the petition. Because I feel sensibly that the decision we have been compelled to render, in obedience to the law as it is written, and which it is our function to declare and not to alter, may work great hardship in this particular case; and, as a general rule applicable to a certain class of patents, may disappoint expectations long, though erroneously, considered by the public as well founded. Unfortunately, this is not a case where such common error can be said to have made itself law; and after as thorough an investigation as I am capable of making, I feel constrained to concur in the position so fully elaborated by the chief justice, that on every point essential to the case of the petitioner, not merely the weight of authority, but all the authorities, are against him. Against a clear and explicit rule of law, no arguments from inconvenience, however forcibly urged, can prevail. As to the existence and extent of the right of a riparian proprietor to use the water for irrigation, I intimate no opinion.